

**Filed**
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

# IN RE: APPLICATION OF THE PEOPLE OF GUAM.

Supreme Court Case No. CVA23-016
Superior Court Case No. SP0079-23

# OPINION

# Cite as: 2024 Guam 16

Appeal from the Superior Court of Guam
Argued and submitted on July 10, 2024
Hagåtña, Guam



**E-Received**
12/31/2024 4:29:23 PM

BEFORE: ROBERT J. TORRES, Chief Justice; F. PHILIP CARBULLIDO, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**TORRES, C.J.:**

[1]      Petitioner-Appellant (hereinafter, "Appellant") appeals the Superior Court's denial of a motion to quash a grand jury subpoena *duces tecum*.[1] This case, along with another pending appeal regarding a separate denial of a motion to quash a grand jury subpoena *duces tecum*, raises legal issues of first impression concerning Guam grand juries. Guam's current grand jury statutory scheme combines federal and California law. Both jurisdictions adopted the grand jury as it existed at common law, with alterations by statute and court rule. A review of the history of grand juries generally and their use in Guam leads us to the conclusion that the Guam Legislature also adopted the common law grand jury, with its own alterations. The trial court applied the correct legal standard when it construed Guam's grand jury scheme, given the common law decisions of other courts. The trial court correctly concluded that a grand jury need not identify a felony at the outset of its inquiry.

[2]      The law presumes that a grand jury acts within the legitimate scope of its authority, without a strong showing to the contrary. Here, Appellant did not make the required showing. The trial court found that Appellant did not rebut the presumption that the grand jury was acting within the scope of its authority. On appeal, Appellant fails to show this finding was clearly erroneous. The trial court did not abuse its discretion in denying the motion to quash because it applied the correct legal standard, and its factual findings are supported by substantial evidence. We affirm.

---

[1] *Duces tecum* is a Latin phrase meaning "bring with you." *Duces Tecum*, *Black's Law Dictionary* (12th ed. 2024). A subpoena *duces tecum* commands a person to produce books, papers, documents, or other objects and bring them to the place the person is ordered to appear. *See* 8 GCA § 75.20 (2005).

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**[3]**     Three weeks after Typhoon Mawar made landfall on Guam, a subpoena *duces tecum* (the "subpoena" or "SDT") was issued by a Guam grand jury to the custodian of records for Appellant. The subpoena commanded the custodian of records to "appear and testify before the INVESTIGATIVE GRAND JURY" one week later.  Record on Appeal ("RA"), tab 3 (Decl. Counsel re: Exs. Supp. Mot. Quash, June 19, 2023), Ex. 8 at 1 (Subpoena Duces Tecum, June 13, 2023).  The subpoena also commanded the custodian to bring these documents when they appeared before the grand jury:

> 1.  Any and all purchase orders entered into during the period of May 1, 2023 to present.
>
> 2.  Any and all solicitations for quotes issued during the period of May 1, 2023 to present.
>
> 3.  Records regarding [Agency 1's] plan in effect during the period of May 1, 2023 to present.
>
> 4.  Any and all correspondence with [Appellant] regarding any purchase orders issued during the period of May 1, 2023 to present.
>
> 5.  Any and all correspondence with [Agency 2] regarding any purchase orders issued during the period of May 1, 2023 to present.
>
> 6.  Any and all correspondence with any vendor regarding any purchase orders issued during the period of May 1, 2023 to present.
>
> 7.  Any and all correspondence related to requests by any media to be present onsite at [Agency 1] during Typhoon Mawar.

*Id.* at 2.

**[4]**     Counsel for Appellant contacted the Attorney General's office, indicating the subpoena "appear[ed] to be the same subpoena issued to [Agency 1]," and that they intended to move to quash.  RA, tab 3, Ex. 9 (Appellant Email re: Mot. Quash, June 16, 2023).  A few days later, Appellant moved to quash in the Superior Court, with a "Non-Criminal Case Cover Sheet"

attached that indicated the case was an *ex parte* "other" civil matter. The case was docketed as a special proceeding.

[5] In the motion to quash, Appellant emphasized their office was "substantially involved in managing the typhoon recovery effort," and that compliance with the subpoena would be unreasonable and oppressive. RA, tab 2 at 2 (Mot. Quash, June 19, 2023). Appellant argued that although they were not aware "of the general subject matter of the investigation in this case, such that it can assess the materiality or relevance of requested material to the investigation pending before the grand jury. . . . on its face, the SDT is overly broad and the demand for documents therein is not made with reasonable particularity." *Id.* at 3. They contended, "The expansive categories of materials sought suggest that the [Office of the Attorney General] is engaged in an impermissible and arbitrary fishing expedition. Compliance with the SDT three (3) weeks after the landfall of Typhoon Mawar, while the government of Guam and Appellant [in] particular, is actively engaged in emergency response efforts, is particularly oppressive and burdensome." *Id.*

[6] In their motion to quash below, contrary to their position on appeal, Appellant acknowledged past decisions of this court which have held that federal case law on quashing grand jury subpoenas "is 'especially persuasive' where Guam law mirrors federal law." *Id.* at 6 (quoting *Asia Pac. Hotel Guam, Inc. v. Dongbu Ins. Co.*, 2011 Guam 18 ¶ 19). They cited the U.S. Supreme Court's decision in *United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991), for the propositions that "[g]rand juries are not licensed to engage in arbitrary fishing expeditions," and that a court may be justified in requiring the prosecutor to "reveal the general subject of the grand jury's investigation before requiring the challenging party to carry its burden of persuasion." *Id.* at 7 (alteration in original) (quoting *R. Enters.*, 498 U.S. at 299, 302). Appellant argued that "pending information regarding the subject matter of the investigation," the subpoena appeared "to demand

documents that are immaterial to a focused investigation" and "effectively amount[ed] to a fishing expedition, casting a wide net of inquiry over all aspects of procurements undertaken by [Appellant] over a forty-five (45) day period." *Id.*

[7]      Appellant highlighted that "[t]he most obvious evidence the SDT is simply a fishing expedition unrelated to any focused criminal investigation is item 7 of the SDT," which demanded correspondence related to media requests to be onsite at Agency 1 during the typhoon. *Id.* at 8. Appellant seems to have perceived the precipitating events that led to this demand, arguing, "There is no possible criminal liability for any government official denying civilians access to the facilities of [Agency 1] during an emergency. If there is no possible criminal liability from denying civilians access to a government facility, then there can be no valid reason related to a criminal investigation for such a request." *Id.* They argued it was "incomprehensible that the [People] would take essential personnel of Appellant out of commission to satisfy this sweeping demand" and force Appellant to "divert critical personnel and resources from urgent response efforts and hinder the provision of necessary services to the people of Guam." *Id.*

[8]      The People also relied on federal case law in their response to the motion to quash, arguing, "A grand jury subpoena duces tecum is unreasonably broad . . . if there is no reasonable probability that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." RA, tab 7 at 3 (Opp'n Mot. Quash, Aug. 2, 2023) (quoting *In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993*, 846 F. Supp. 11, 11 (S.D.N.Y. 1994)). The People's response revealed that "[i]n this case, the grand jury is seeking specific categories of documents covering a limited time period in the People's investigation of possible wrongdoing in the awarding of government contracts." *Id.* at 5. They argued, "The grand jury's subpoena seeks a narrow tranche of documents that deal with Appellant's procurement

activities and related communications during a finite time period." *Id.* "[T]he very purpose of requesting the information is to ascertain whether probable cause exists." *Id.* (alteration in original) (quoting *R. Enters.*, 498 U.S. at 297). The People argued that the intervening passage of time since the typhoon lessened the alleged oppressiveness of the subpoena. *Id.* at 6. They also expressed their willingness to explain the relevance of the subpoenaed materials to the court if so requested. *Id.* at 7.

[9]     In reply, Appellant argued, "The [People] effectively concede[d] that the SDT was not in furtherance of the grand jury's consideration of an indictment . . . ." RA, tab 10 at 2 (Reply Opp'n Mot. Quash, Aug. 24, 2023). Appellant raised for the first time on reply the idea that Guam's statutory scheme does not authorize a "purely investigatory grand jury." *Id.* at 2-3. Appellant argued that because Guam law only authorizes a grand jury to inquire into felonies and related misdemeanors, "grand jury subpoenas provided for in [8 GCA §] 75.45 must be issued in furtherance of investigations into the proposed felony indictments." *Id.* at 8. Appellant claimed that the prosecution must tailor a subpoena *duces tecum* "to specific felony charges." *Id.* at 10.

[10]     At the hearing on the motion to quash, Appellant argued that a Guam "grand jury can investigate, but within the guardrails of an indictment that's been issued by the government -- or by the [People]." Transcript ("Tr.") at 5 (Mot. Hr'g, Oct. 17, 2023). Appellant refined their argument to what they now claim on appeal: a grand jury must be presented with a proposed indictment before it can issue a subpoena. *Id.* at 7-9. Commenting on this line of reasoning, the trial court stated, "It just seem[s] to me, . . . if they were limited to starting out with an indictment, under [8 GCA §] 50.10(a), it would say, 'The grand jury is a body summoned by the court and sworn to inquire into indictments.' Instead, . . . its plain language appears to not be confined to that process." *Id.* at 9. When asked to clarify the confusion caused by the subpoena referring to

an "investigative grand jury," the Assistant Attorney General who signed the subpoena stated, "[I]t was just the normal grand jury. . . . that has the power to indict and with that power to indict, presupposes the ability to conduct investigations." *Id.* at 17-18. The People reiterated that the grand jury was seeking "[s]pecific categories of documents covering a limited time period in investigation [of] possible wrongdoing in the awarding of government contracts in the timeframe after Typhoon Mawar." *Id.* at 21. When asked by the trial court, the People confirmed their position was that the empaneled grand jury was moving forward under 8 GCA § 50.10(a), inquiring into felonies and related misdemeanors. *Id.* at 24.

[11]     After permitting supplemental briefing on the legislative history of Guam's grand jury statutes, the Superior Court issued a decision and order denying the motion to quash. The trial court concluded "that the grand jury has appropriately acted in convening and in serving the Subpoena, the Subpoena is reasonable, and compliance would not be oppressive." RA, tab 18 at 1 (Dec. & Order, Nov. 22, 2023). The trial court rejected Appellant's reading of the statutes, finding the plain language permitted grand juries to inquire into felonies and misdemeanors, including by issuing subpoenas *duces tecum*. *Id.* at 2-4. It also concluded, "There is no other indication or 'clear legislative history' that suggests the Guam Legislature intended to limit the grand jury's investigatory powers . . . ." *Id.* at 4. The trial court relied on *R. Enterprises* for the proposition that a court presumes a grand jury is acting within the scope of its authority and found that "as [Appellant] has not presented evidence to rebut this presumption, the Court accepts [the People's] representation that the grand jury is proceeding under section 50.10(a)." *Id.* at 3 (citing *R. Enters.*, 498 U.S. at 301).

[12]     The trial court also relied on *R. Enterprises* in rejecting Appellant's challenge to the reasonableness of the subpoena, concluding that "the responding party carries the burden of

demonstrating unreasonableness, that is, 'there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation.'" *Id.* at 5 (quoting *R. Enters.*, 498 U.S. at 301). The court stated that under *R. Enterprises*, the People had revealed the general subject of the grand jury's investigation to be "wrongdoing in [Appellant's] procurement activities." *Id.* The trial court found that "[f]ive of the requests directly relate to purchase orders and quotations and are therefore reasonable." *Id.* It also found that "[w]hile not directly related to procurement activity, the [other] two requests appear to involve the timeframe during and after the typhoon." *Id.* The court concluded Appellant had failed to meet their "burden of showing no reasonable possibility that the category of materials sought are relevant to the grand jury's investigation." *Id.* Finally, the trial court rejected Appellant's argument that compliance would be oppressive because Appellant "made that argument in the weeks following the typhoon and in the midst of typhoon recovery. Six months have now passed and the Court finds no basis to find current compliance oppressive." *Id.*

[13]    Appellant timely appealed. Appellant filed a request to take judicial notice of a decision and order, issued by a different Superior Court judge, granting the motion to quash the grand jury subpoena served on Agency 1.[2]

## II. JURISDICTION

[14]    We have appellate jurisdiction over civil appeals from final judgments or final orders entered in the Superior Court. 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 118-157 (2024)); 7 GCA §§ 3107, 3108(a) (2005); 7 GCA § 25102(a) (2005). We have an independent

---

[2] The People do not oppose the motion, which we grant. Although we can properly take judicial notice of the existence of the decision, we do not take judicial notice of "any specific factual finding, legal reasoning, or legal conclusion" from that case, as it would be inappropriate under Guam Rule of Evidence 201(b). *Corbitt v. Balt. City Police Dep't*, 675 F. Supp. 3d 578, 587 (D. Md. 2023) (quoting *United States v. Daley*, 378 F. Supp. 3d 539, 547 (W.D. Va. 2019)). We generally will not take notice of any court document "to establish the truth of the underlying factual contention or the accuracy of the legal conclusions set forth therein." *Steinmeyer v. Am. Ass'n of Blood Banks*, 715 F. Supp. 3d 1302, 1310 (S.D. Cal. 2024) (citation omitted).

obligation to ensure that we have jurisdiction. *Antonio B. Won Pat Int'l Airport Auth. v. DFS Guam L.P.*, 2023 Guam 7 ¶ 13 (per curiam). As our jurisdiction over appeals of the Superior Court's denial of a motion to quash a grand jury subpoena is an issue of first impression, we find it necessary to outline our jurisdiction in these types of appeals.

[15]    This case began with the filing of a special proceeding in the Superior Court. The sole purpose of the proceeding was to quash the subpoena *duces tecum* served on Appellant. That motion was eventually denied. A separate judgment was then entered. Shortly after, Appellant filed a notice of appeal.

[16]    In most jurisdictions, including federal courts, "motions to quash [grand jury] subpoenas are not directly reviewable, and the witness must await the imposition of a contempt sanction before appellate review is available." Sara Sun Beale et al., *Grand Jury Law and Practice* § 11:13 (2d ed. 2024) (footnote omitted). This rule can be traced to decisions of the U.S. Supreme Court which have held that "one to whom a subpoena is directed may not appeal the denial of a motion to quash that subpoena but must either obey its commands or refuse to do so and contest the validity of the subpoena if he is subsequently cited for contempt on account of his failure to obey." *United States v. Ryan*, 402 U.S. 530, 532 (1971) (citing *Cobbledick v. United States*, 309 U.S. 323 (1940)). However, state courts have not universally adopted this rule. Maryland, for example,

> has consistently refused to follow the non-appealability rule adopted by the Supreme Court in . . . *Cobbledick*[] and *Ryan*. When a Maryland trial court denies a motion to quash or a motion for a protective order, and that action terminates the proceedings in the court, the trial court's denial is appealable even though administrative proceedings, or investigative proceedings, or separate court proceedings where the recipient of the subpoena was not a party, are ongoing.

*Md. State Bd. of Physicians v. Eist*, 11 A.3d 786, 799 n.14 (Md. 2011). Similarly, the Court of Appeals of New York has found that "a motion to quash a *subpoena* issued prior to the commencement of a criminal action, even if related to a criminal investigation, 'is civil by nature,'"

and so "an order resolving a motion to quash such a subpoena is a final and appealable order in a special proceeding that is 'not subject to the rule restricting direct appellate review of orders in criminal proceedings.'" *In re 381 Search Warrants Directed to Facebook, Inc.*, 78 N.E.3d 141, 146 (N.Y. 2017) (citations omitted); *see also People v. Coulibaly*, 152 N.Y.S.3d 499, 501 (App. Div. 2021) ("[E]ven when an order is issued pursuant to a criminal investigation or relates to a collateral aspect of a criminal proceeding, if the nature of the relief sought is civil in nature and the order can be said to be final and does not affect the criminal judgment itself, courts have found the matter to be civil and appeals from such orders are not constrained by the rule controlling appeals from orders in criminal proceedings.").

[17]    Unlike the federal courts, we have held that a contempt order is not appealable and may instead be challenged by a writ of *certiorari*. *Paguio v. Paguio*, 2014 Guam 36 ¶¶ 15, 17. Other jurisdictions where contempt orders are not appealable, *e.g.*, *Nichols v. Nichols*, 238 So. 2d 186, 188 (Ala. Civ. App. 1970), do not require certiorari petitions from contempt orders to review denials of motions to quash grand jury subpoenas, *e.g.*, *Ex parte Fitch*, 715 So. 2d 873, 874-78 (Ala. Crim. App. 1997) (granting mandamus relief after trial court denied motion to quash grand jury subpoena *duces tecum*); *cf. Ex parte Ala. Dep't of Hum. Res.*, 719 So. 2d 194, 196 (Ala. 1998) ("Although [petitioner] has styled its petition to this Court as a petition for a writ of certiorari to the Court of Civil Appeals, we believe it is more appropriate to treat the petition as one for a writ of mandamus directed to the circuit court."). Requiring a witness to be held in contempt to challenge a grand jury subpoena may be unfair, and proceedings for writs of mandamus or prohibition to review the contempt are not ideal. We clarify that the procedure followed in this case is generally the proper manner of challenging a grand jury subpoena *duces tecum*: initiating a civil action in the Superior Court and moving to quash under seal with a non-criminal cover

sheet.  A non-appealability rule requiring a witness to be held in contempt to challenge a grand jury subpoena should not be the sole avenue to obtain relief in Guam.

[18]     Nothing in our opinion should be construed as preventing a witness who has been held in contempt for refusing to comply with a grand jury subpoena from litigating a motion to quash as part of contempt proceedings.  *Cf. Guam Mem'l Hosp. Auth. v. Superior Court*, 2012 Guam 17 ¶ 19 (discussing the possibility of challenging legislative subpoena *duces tecum* through contempt proceedings).  When a witness faces a grand jury subpoena *duces tecum* they feel should be quashed, they have two options: either (1) file a civil action making the motion to quash, or (2) refuse to comply and litigate a motion to quash in contempt proceedings.  In either case, appellate review is available.  In a civil action, once the motion is resolved, the losing party may seek review by filing a notice of appeal.  If the witness is held in contempt and the trial court denies the motion to quash, appellate review is available by petitioning for a writ of certiorari challenging the contempt citation.  And in cases like this one, where a civil action is filed, when the Superior Court denies the motion to quash and that action terminates the proceedings in that court, the trial court's denial is appealable, even though investigative proceedings to which the recipient of the subpoena was not a party are ongoing.  *See Eist*, 11 A.3d at 799 n.14.

[19]     When a civil action is filed to challenge a grand jury subpoena, an order resolving the motion to quash is a final and appealable order.  *See In re 381 Search Warrants Directed to Facebook, Inc.*, 78 N.E.3d at 146.  The procedure followed here to challenge the grand jury subpoena was proper, and we have jurisdiction.

### III.  STANDARD OF REVIEW

[20]     "A trial court's ruling on a motion to quash a subpoena duces tecum is reviewed for an abuse of discretion."  *Guam Election Comm'n v. Responsible Choices for All Adults Coal.*, 2007

Guam 20 ¶ 91. "[A] court abuses its discretion by basing its decision on an erroneous legal standard or clearly erroneous factual findings, or if, in applying the appropriate legal standards, the court misapprehended the law with respect to the underlying issues in the litigation." *People v. Faisao*, 2018 Guam 26 ¶ 12 (alteration in original) (quoting *People v. Mallo*, 2008 Guam 23 ¶ 56). Although the overall review is for an abuse of discretion, the trial court's interpretation of the underlying legal principles is subject to *de novo* review. *Sule v. Guam Bd. of Exam'rs for Dentistry*, 2011 Guam 5 ¶ 8. "A finding of fact is clearly erroneous where it is not supported by substantial evidence, and this court is left with a definite and firm conviction that a mistake has been made." *In re Guardianship of Moylan*, 2018 Guam 15 ¶ 6 (quoting *M Elec. Corp. v. Phil-Gets (Guam) Int'l Trading Corp.*, 2016 Guam 35 ¶ 41). "[L]ike any other issue of fact," we review for substantial evidence a trial court's finding that a party failed to rebut an evidentiary presumption for substantial evidence. *Estate of Auen*, 35 Cal. Rptr. 2d 557, 564 (Ct. App. 1994) ("'It is for the trier of fact to determine whether the presumption will apply and whether the burden of rebutting it has been satisfied.' We review the trial court's finding that appellants failed to rebut the presumption . . . under the substantial evidence rule like any other issue of fact." (citation omitted)).

[21]     "On abuse of discretion review, an appellate court does not review whether an alternative course of action was available, but only whether the trial court's decision was allowable." *People v. Bosi*, 2022 Guam 15 ¶ 66. "The concept of discretion implies that a decision is lawful at any point within the outer limits of the range of choices appropriate to the issue at hand; at the same time, a decision outside those limits exceeds or, as it is infelicitously said, 'abuses' allowable discretion." *Id.* (quoting *Eastway Constr. Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir.

1987)).  This court will not simply "substitute its judgment for that of the trial court."  *Id.* ¶ 71 (quoting *People v. Quintanilla*, 2001 Guam 12 ¶ 9).

## IV.  ANALYSIS

### A.  The Trial Court Correctly Concluded that a Grand Jury Need Not Identify a Felony at the Outset of Its Inquiry

[22]    Appellant argues that the trial court erroneously concluded that "grand jury investigations in Guam are not confined to felonies and related misdemeanors."  Appellant's Br. at 21 (Mar. 19, 2024).  But the trial court correctly stated that "Guam law defines a grand jury as 'a body of the required number of persons summoned by the court and sworn to inquire into felonies and any related misdemeanors triable by the court.'"  RA, tab 18 at 2 (Dec. & Order) (quoting 8 GCA § 50.10(a) (2005)).  And it found that "the [People have] empaneled the grand jury to inquire into a felony and related misdemeanors—within the plain meaning and scope of section 50.10(a)."  *Id.* at 3.  Appellant's argument can more accurately be understood as disagreeing with the construction the trial court placed on the phrase "inquire into felonies and any related misdemeanors" in 8 GCA § 50.10(a).  Appellant argues that the plain language of the statutory scheme requires identifying a felony at the outset of a grand jury's inquiry.  *See* Appellant's Br. at 26 ("[P]roposed charges or a bill of indictment must be presented to a Guam grand jury at the outset of its inquiry, and not at the end . . . .").

[23]    "When interpreting a statute, we begin with its plain language because our 'task is to determine whether . . . the statutory language is plain and unambiguous.'"  *In re Est. of Leon Guerrero*, 2023 Guam 10 ¶ 45 (quoting *In re Guardianship of Moylan*, 2021 Guam 15 ¶ 36) (internal quotation marks omitted).  A statute is ambiguous if—after looking at the entire law and its object and policy—its plain language is susceptible to more than one reasonable interpretation.

*Id.* ¶ 46. "When a statute is ambiguous, courts may look to legislative history and other sources." *Id.* ¶ 45.

[24]     The text of section 50.10(a) is ambiguous because it is susceptible to more than one reasonable interpretation. Appellant's proposed interpretation is reasonable because the statute's plain language can be read to require a grand jury to be presented with a proposed indictment at the outset of its inquiry. However, another reasonable interpretation is that this is simply an introductory provision which reflects that grand juries cannot return indictments that charge only misdemeanors. We look to legislative history and other sources to help resolve this ambiguity.

[25]     Appellant's reading of the statute has some measure of historical support. However, as leading scholars on criminal procedure note, the critics and supporters of grand juries with broad investigative powers are "divided over the lessons to be drawn from the history of that institution." 3 Wayne R. LaFave et al., *Criminal Procedure* § 8.2(c) (4th ed. 2024). A review of this history illustrates that although proposed and advocated for, the creation of the grand jury contemplated in Appellant's arguments seems unprecedented within the United States.[3]

[26]     Both parties argue that federal and California authorities are persuasive to varying degrees because Guam's grand jury statutory scheme is a blend of the Federal Rules of Criminal Procedure and the California Penal Code ("CPC"). *See* Appellant's Br. at 15, 27-32; Appellee's Br. at 9, 19-

---

[3] There is some indication that, before their abolishment in other common law jurisdictions, such as New Zealand, grand juries were limited to screening indictments for probable cause, much in the way judges now do at preliminary hearings. *See, e.g.*, *Saywell v. Attorney-General* [1982] 2 NZLR 97 (HC) at 100, 104, http://www.nzlii.org/nz/cases/NZHC/1982/474.pdf ("The section was enacted as part of the Act of 1961 which abolished the system whereby an indictment—at that stage called a 'bill of indictment'—was submitted to the Grand Jury, essentially to determine whether the prosecution had evidence sufficient to put the accused on his trial. If the Grand Jury was satisfied that there was such evidence, they returned a 'true bill'—which then went forward as an indictment presented, not by the Crown Solicitor, but by the Grand Jury. In effect, s.347 transferred to the trial judge responsibility for decisions formerly the province of Grand Juries."). *But see Thomson Newspapers Ltd. v. Canada (Dir. of Investigation & Rsch., Restrictive Trade Pracs. Comm'n)*, 1990 CarswellOnt 92 ¶ 97 ("It is not necessary, as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one." (quoting *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 20809 (1946))).

23 (May 20, 2024). Section 50.10(a) was based on CPC § 888, *see* 8 GCA § 50.10, Note, although the language was changed from inquiring into "public offenses" to "felonies and any related misdemeanors," *compare* Cal. Penal Code § 888 (West 2023), *with* 8 GCA § 50.10(a). A review of the history of grand juries generally and their adoption in Guam specifically leads us to conclude that the grand jury's subpoena power is not limited to situations when a specific charge is pending before the grand jury against a particular person.

[27]    Although there may be strong historical and policy arguments for the practice urged by Appellant, the Guam Legislature could not have intended such a significant change when it substituted the words "felonies and related misdemeanors" for "public offense." Any significant alteration of grand jury procedure that "would run counter to the whole history of the grand jury institution," *United States v. Williams*, 504 U.S. 36, 50 (1992) (quoting *Costello v. United States*, 350 U.S. 359, 364 (1956)), must come from the legislature with language that "clearly and unequivocally discloses an intention to depart from, alter, or abrogate the common-law," *see People v. Antolin*, 216 Cal. Rptr. 3d 349, 352 (Ct. App. 2017). The Guam Legislature did not do so.

### 1. The history of grand juries

#### a. Common law origins in England

[28]    Our discussion of grand juries begins with the English Common Law. "The grand jury commonly is traced back to the Assize of Clarendon," which was issued in 1166 during the reign of King Henry II. 3 LaFave et al., *supra*, § 8.2(a). "The Assize clearly was designed not to provide protection for those suspected of crime, but rather to lend assistance to government officials in the apprehension of criminals." *Id.* As LaFave observes, the English had turned to trial by jury by the end of the fourteenth century, with an accusatory jury of twenty-four persons and trial of guilt

before a twelve-person petit jury. *Id.* "The accusatory jury became known as 'le graunde inquest,' which probably explains its eventual title of grand jury." *Id.* In its earliest iterations, the grand jury "remained essentially a body designed to assist the Crown in ferreting out criminals," with accusations initiated either by the jurors, private complainants, or a representative of the Crown. *Id.* When the accusation was initiated on a juror's knowledge or on information provided by a private complainant, the grand jury's charging document was described as "presentment." *Id.* (footnote omitted). Typically, the representative of the Crown would be a justice of the peace, who would produce witnesses to testify before the grand jury in support of a particular charge. *Id.* In such cases where the accusation was placed before the jury by the Crown's representative, the charging document was called an "indictment." *Id.* "The Crown's representative ordinarily would place a proposed indictment before the grand jury, and if the grand jury found the Crown's evidence sufficient to proceed, it issued the indictment, declaring it to be a 'true bill.'" *Id.* If the grand jury concluded that the evidence was insufficient, it returned a finding of "no bill." *Id.*

[29]     "While it is not clear when grand juries first resorted to compulsory process to secure the attendance and testimony of witnesses, the general common-law principle that 'the public has a right to every man's evidence' was considered an 'indubitable certainty' that 'cannot be denied' by 1742." *Kastigar v. United States*, 406 U.S. 441, 443 (1972) (footnote omitted). Over time, the grand jury began to assume significant independence, and by the late seventeenth century, the grand jury was widely celebrated as a "bulwark against the oppression and despotism of the Crown." 3 LaFave et al., *supra*, § 8.2(a) (footnote omitted). "Thus, by the end of the century, the English grand jury had emerged . . . as 'a virtual Janus who, one moment acted as the vigilant prosecutor and the next as the defender of those who were unjustly accused.'" *Id.* (footnote omitted).

### b. Adoption and development in the United States

**[30]** "Along with other elements of the English law, the grand jury was adopted as part of the criminal justice process in the American colonies." *Id.* § 8.2(b). "In the American colonies, the 'shielding role' of the grand jury was equally revered," as it was in England, 4 Wayne R. LaFave et al., *Criminal Procedure* § 15.1(a) (4th ed. 2024) (footnote omitted), but the grand jury also developed as a tool of resistance against the Crown "that extended beyond the enforcement of the criminal law," 3 LaFave et al., *supra*, § 8.2(b). As LaFave helpfully summarizes:

> The English grand jury had occasionally used its power of presentment to criticize action or inaction of government officials that fell short of criminal misconduct. The American grand juries made extensive use of that authority, and their presentment reports became the primary vehicle for the expression of the complaints of the citizenry on a wide range of matters. As community dissatisfaction with England's colonial policies grew stronger, these reports were most frequently critical of the Crown's officials in America. At the same time, colonial grand juries were more frequently at odds with royal officials as to appropriate cases for criminal prosecution. . . . [G]rand juries issued criminal presentments against various royal officials, including British soldiers, on which the Crown frequently refused to prosecute.

*Id.* (footnotes omitted).

**[31]** The U.S. Supreme Court has observed that "[u]ndoubtedly the framers of [the Bill of Rights] had for a long time been absorbed in considering the arbitrary encroachments of the crown on the liberty of the subject, and were imbued with the common-law estimate of the value of the grand jury as part of its system of criminal jurisprudence." *Ex parte Bain*, 121 U.S. 1, 12 (1887), *overruled on other grounds by United States v. Cotton*, 535 U.S. 625 (2002). Thus, the protective role of the grand jury as a shield against arbitrary prosecution was enshrined as a constitutional right though the adoption of the first clause of the Fifth Amendment, which provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. Const. amend. V; *see also* 4 LaFave et al., *supra*, § 15.1(a).

Federal courts uniformly interpreted the Fifth Amendment to have adopted the common law grand jury. *E.g.*, *Ex parte Wilson*, 114 U.S. 417, 423 (1885) ("The fifth amendment . . . manifestly had in view that rule of the common law . . . ."); *In re Apr. 1956 Term Grand Jury*, 239 F.2d 263, 268 (7th Cir. 1956) ("The Fifth Amendment adopted the grand jury, as it existed at common law, and thereby made it a part of the fundamental law of the United States for the prosecution of crime. No part of the constitution defines the grand jury. No act of congress has ever attempted such a definition. It had its origin in the common law and has existed for many hundred years." (footnote omitted)).

[32]     After independence, grand juries in the United States "continued to pursue on their own initiative a 'public watchdog' function, especially in the western territories. Grand juries actively reviewed a wide range of grievances presented by citizens, and often conducted 'searching investigations into corruption in government or widespread evasion of the laws.'" 3 LaFave et al., *supra*, § 8.2(b) (footnote omitted). American common law grand juries "had authority to seek evidence on matters that were never put before it by the prosecutor," which was commonly described as its "inquisitorial function." *Id.* § 8.4(b) (footnote omitted).

[33]     During the nineteenth century, grand juries began to be harshly criticized, and in 1859, Michigan became the first state to allow prosecutors to bring felony charges by information. *Id.* § 8.2(b). "Several states followed Michigan's lead, and in 1884, the constitutionality of this shift from indictment to information was upheld in *Hurtado v. California*." *Id.* (footnote omitted). As LaFave explains:

> When the grand jury system was challenged during the middle portion of the nineteenth century, the proposed reforms included not only eliminating the requirement of prosecution by indictment, but also restricting the inquisitorial and reporting powers of the grand jury. Grand juries were criticized as untrained and unprofessional, using their reporting powers for political ends, and "the only one of our public agents that is totally irresponsible for officials acts." At a time when

> private prosecution without permission of the prosecutor was being eliminated, grand jury authority to issue presentments based on information gathered from private complainants was criticized as an evasion of that reform.

*Id.* § 8.4(b) (footnotes omitted).

[34]     Although never fully adopted, the most radical reform of grand jury authority was advanced in the proposed "Livingston Code," which "would have abolished the grand jury's authority to independently initiate inquiries, or issue presentments or reports. The grand jury's function would be limited to screening proposed indictments put before it by the prosecutor." *Id.* (footnotes omitted). As LaFave explains, grand juries in "almost every jurisdiction" keep "at least some aspects" of their inquisitorial function, although many states have "eliminated or restricted at least a part of this independent investigatory power." *Id.*

[35]     While some states like Pennsylvania and Tennessee adopted moderate restraints on grand jury investigatory power, "[t]hese proposed restraints were rejected by other courts, who refused to alter the common law authority of the grand jury." *Id.* For example, the Maryland Court of Appeals observed that although grand juries in other states had been limited to "the investigation only of cases laid before them or falling under their personal knowledge or observation," the Maryland grand jury kept its "plenary inquisitorial powers." *Blaney v. State*, 21 A. 547, 547-48 (Md. 1891).

[36]     In *Hale v. Henkel*, the U.S. Supreme Court adopted a similar position when it agreed that a grand jury's right to subpoena witnesses was not limited to situations in which a "specific 'charge' [was] pending before the grand jury against any particular person." 201 U.S. 43, 59-60, 65 (1906), *overruled on other grounds by Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964). The Court acknowledged that "[u]nder the ancient English system, . . . the usual practice was to prepare the proposed indictment and lay it before the grand jury for their

consideration." *Id.* at 59. But, the Court ultimately concluded, "[w]hatever doubts there may be with regard to the early English procedure," it was "entirely settled since the adoption of the Constitution" that in the United States, "the examination of witnesses need not be preceded by a presentment or indictment formally drawn up." *Id.* at 60-61, 65. As the Court explained: "It is impossible to conceive that in such cases the examination of witnesses must be stopped until a basis is laid by an indictment formally preferred, when the very object of the examination is to ascertain who shall be indicted." *Id.* at 65.

[37]    Additionally, federal courts, along with many state courts, long held that a witness could not challenge the jurisdiction of a grand jury. As one treatise explains:

> In most jurisdictions the courts will not interrupt an ongoing grand jury proceeding to consider challenges to the grand jury's jurisdiction. In practical terms, this means that a witness who is subpoenaed to appear before a grand jury is not entitled to question whether the matter being investigated is within the jurisdiction of the grand jury. If the grand jury exceeds its authority, this may affect the validity of the indictment, but it does not ordinarily justify interrupting an ongoing investigation.

Beale et al., *supra*, § 9:25 (footnote omitted). The roots of this majority rule can be traced to the U.S. Supreme Court's decision in *Blair v. United States*, 250 U.S. 273 (1919), where it held that a witness before a federal grand jury cannot "challenge the authority of . . . the grand jury, provided they have a de facto existence and organization." 250 U.S. at 282.

[38]    Over time, a minority rule developed based on the Third Circuit's decision in *In re Grand Jury Proceedings*, 486 F.2d 85 (3d Cir. 1973) ("*Schofield I*"): "[T]he Government [is] required to make some preliminary showing by affidavit that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose." 486 F.2d at 93. Courts and scholars routinely refer to such an affidavit as a "*Schofield* affidavit." *See, e.g.*, *Robert Hawthorne, Inc. v. Cnty. Investigating Grand Jury*, 412

A.2d 556, 557-561 (Pa. 1980). As a corollary to this rule, "the Third Circuit [has] expressly rejected the argument that a person to whom a subpoena duces tecum is directed lacks standing to challenge the jurisdiction of the issuing body." Beale et al., *supra*, § 9:25 (citing *In re Grand Jury Impaneled Jan. 21, 1975 (Freedman)*, 529 F.2d 543, 548 n.7 (3d Cir. 1976)).

[39]     In 1946, the Federal Rules of Criminal Procedure were adopted, which "for all practical purposes, . . . abolished the [federal] grand jury's presentment power." *United States v. Navarro-Vargas*, 408 F.3d 1184, 1208 n.29 (9th Cir. 2005) (quoting Renee B. Lettow, Note, *Reviving Federal Grand Jury Presentments*, 103 Yale L.J. 1333, 1343 (1994)). Today, the touchstone for a grand jury's investigative power and the ability of witnesses to challenge a subpoena is the U.S. Supreme Court's decision in *United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991).

### c.  Modern use of the grand jury

[40]     "The common law grand jury is said to constitute both 'the shield and the sword' of the American criminal justice process." 3 LaFave et al., *supra*, § 8.1(a) (footnote omitted). The traditional grand jury serves two functions: (1) to screen the prosecutor's decision to charge, and (2) to uncover evidence not previously available to the prosecution. *Id.*

[41]     Today, the United States is one of only two common law countries that retains the grand jury. Nino C. Monea, *The Fall of Grand Juries*, 12 Ne. U. L. Rev. 411, 465 (2020) ("The United States remains one of only two countries in the world—the other being Liberia—that still uses grand juries."). Its use was largely abolished in the United Kingdom in 1933, 3 LaFave et al., *supra*, § 8.2(b) n.17, while jurisdictions like Canada and New Zealand followed in the subsequent decades, *United States v. Stuart*, 489 U.S. 353, 363 n.4 (1989) (collecting authorities discussing elimination of grand jury in Canada and New Zealand).

**[42]**     Within the United States, "there has been a gradual movement of the states to prosecution by information." 3 LaFave et al., *supra*, § 8.2(b). Today, eighteen states[4] and the District of Columbia continue to require prosecution by indictment for all felonies (unless waived). 4 LaFave et al., *supra*, § 14.2(c). But "among those states which allow prosecution by information, all but two still authorize the optional use of the grand jury indictment, and all provide for the continued use of the investigative grand jury."[5] 3 LaFave et al., *supra*, § 8.2(b). Thus, in every jurisdiction in the United States where a grand jury exists, they have investigatory power.

**[43]**     Among the current indictment jurisdictions, the right to indictment by grand jury is statutory in Virginia and New Hampshire. 4 LaFave et al., *supra*, § 15.1(d). Grand juries in Alabama, Mississippi, and Delaware are prevented from returning indictments that do not charge felonies. *Id.* "In large communities in indictment jurisdictions, prosecutors often have several grand juries operating simultaneously," with different informal designations. 3 LaFave et al., *supra*, § 8.1(a). The majority are informally designated "indicting" grand juries, which are "engaged primarily in screening fully or almost fully investigated cases." *Id.* A minority of grand juries are informally designated "investigative" grand juries, which "participate in major

---

[4] These states are Alabama, Alaska, Delaware, Georgia, Kentucky, Maine, Massachusetts, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Ohio, South Carolina, Tennessee, Texas, Virginia, and West Virginia. 4 Wayne R. LaFave et al., *Criminal Procedure* § 15.1(d) (4th ed. 2024).

[5] Connecticut and Pennsylvania have repealed provisions for indicting grand juries but have retained a form of investigating grand juries. 3 Wayne R. LaFave et al., *Criminal Procedure* § 8.1(a) n.4. Guam is unique among the U.S. territories in that the Northern Mariana Islands, U.S. Virgin Islands, American Samoa, and Puerto Rico do not have any type of local grand jury. *See* James P. Conlan, *In Defense of "Malicia Premeditada": A Correction of the Historiography Underlying the New Definitions of Murder in Articles 105 and 106 of the Puerto Rico Penal Code of 2004*, 76 Rev. Jur. U.P.R. 193, 211 n.55 (2007) (discussing adoption of grand jury in Puerto Rico from 1918 until 1936); *Dennie v. People*, 66 V.I. 143, 151 (Super. Ct. 2017) ("[F]elonies, misdemeanors, and petty offenses are commenced by information or complaint in the Virgin Islands since the Legislature has not implemented a grand jury system yet."); *Commonwealth v. Diaz*, 2013 MP 20 ¶ 32 (discussing how there is no federal right to grand and petit juries in local prosecutions pursuant to the Covenant establishing Commonwealth of Northern Mariana Islands, but jury trials have been adopted by statute on limited basis ); *United States v. Lee*, 159 F. Supp. 2d 1241, 1245 (D. Haw. 2001) ("American Samoa does not have a grand jury system. A felony charge is initiated by the filing of an information." (citing Amer. Samoa Rules of Crim. P. 7(a))), *aff'd*, 472 F.3d 638 (9th Cir. 2006).

investigations, and then shift to the role of screening and indicting should the investigation possibly produce enough evidence to charge." *Id.*

[44] As grand jury issues are infrequently litigated, in many jurisdictions there is often a lack of binding authority directly on point for most issues. *See, e.g.*, 3 LaFave et al., *supra*, § 8.4(b) ("In the many states with no statute or judicial decision directly on point, it can be argued that the right of direct access remains as at common law." (footnotes omitted)). For example, "[s]tate and federal courts have divided as to whether the grand jury has a 'common law authority' to issue reports in the absence of specific legislative authorization." *Id.* § 8.3(h) (footnote omitted) (noting weight of federal authority finds reports exceed grand jury power). It is arguable that "the elimination of the presentment in the federal system and a number of states" has undercut "the retention of the grand jury's common law inquisitorial authority." *Id.* § 8.4(b). Additionally, "critics and supporters of the investigative grand jury are divided over the lessons to be drawn from the history of that institution." *Id.* § 8.2(c).

[45] Critics argue that the grand jury's power to investigate should "be viewed as an anomaly and kept within narrow confines by close judicial supervision." *Id.* (footnote omitted). These critics argue that it was the grand jury's shielding role—not its inquisitorial power—that earned it a place in the Bill of Rights. *Id.* According to this line of thinking, the investigative role of the grand jury was not critical to its initial acceptance in the United States because "[t]he grand jury's investigatory role was then viewed as entirely secondary and not necessarily distinct from its screening role." *Id.* It is argued that today the significance of these two roles has been reversed, with "the protective function ha[ving] been trivialized and the investigatory function expanded to the point where the institution is almost precisely the opposite of what the Founding Fathers intended." *Id.* (footnote omitted).

[46]     Critics of the grand jury also argue that even if grand juries historically had broad investigative power, that authority was premised on the assumption that grand juries operated with significant independence.  *Id.*  That assumption may no longer hold today, where "the sweeping powers of the grand jury are exercised in reality by the prosecutor alone."  *Id.*; *see also United States v. Laurent*, 861 F. Supp. 2d 71, 89-90 (E.D.N.Y. 2011) (restating 1985 public summary by Chief Judge of New York State "that a grand jury would indict a 'ham sandwich' if asked to do so by the prosecutor" (citation omitted)); *De Leon v. Hartley*, 2014-NMSC-005, ¶ 17, 316 P.3d 896 ("The fact that anyone even casually acquainted with our grand jury system has heard of the indictment of the proverbial ham sandwich demonstrates the need to enforce those few provisions that ensure at least some degree of separation between the prosecutor and the grand jury.").  Realists argue that "this change in the nature of the investigative grand jury, which has converted it into the 'prosecutor's puppet,' requires a corresponding change in judicial attitudes."  3 LaFave et al., *supra*, § 8.2(c) (quoting David Fine, *Federal Grand Jury Investigation of Political Dissidents*, 7 Harv. C.R.-C.L. L. Rev. 432, 499 (1972)).  It has long been argued that courts should "pull back the veil of history and view the investigating grand jury as one would view any other investigatory instrument of government."  *Id.* (footnote omitted).

[47]     Yet "[w]ith few exceptions, American courts have accepted the position that the history of the grand jury provides a solid foundation for its broad investigative authority."  *Id.* (footnote omitted).  "In recent years, courts have been divided as to whether the larger role played by prosecutors in the typical grand jury investigation requires a reexamination of the historical precedents establishing the grand jury's broad investigative authority."  *Id.*  "The Supreme Court . . . has continued to accept those precedents. . . . [and has] made clear that any major alteration of common law grand jury procedure, as reflected in the 'history of the grand jury institution,' must

come from the legislature, not the courts." *Id.* (footnote omitted) (quoting *Williams*, 504 U.S. at 50).

[48]    With this historical background, we now turn to the legislative history of Guam's grand jury statutory scheme.

### 2. History of grand juries in Guam

[49]    Today, a defendant accused of a felony in violation of Guam law has a statutory right to an indictment by a grand jury empaneled by the Superior Court. *See People v. San Nicolas*, 2013 Guam 21 ¶ 24; *People v. Felder*, 2012 Guam 8 ¶¶ 24, 30; 8 GCA § 50.18 (2005). This was not always the case.

[50]    Across the territories acquired by the United States after the Spanish-American War, references to "Spanish Civil Law" served as a pretext to sidestep granting a right to petit and grand juries to "uncivilized" peoples.[6] *Compare Dorr v. United States*, 195 U.S. 138, 145 (1904) ("[T]he civilized portion of the islands had a system of jurisprudence founded upon the civil law, and the uncivilized parts of the archipelago were wholly unfitted to exercise the right of trial by jury."), *with id.* at 154 (Harlan, J., dissenting) ("[G]uaranties for the protection of life, liberty, and property, as embodied in the Constitution, are for the benefit of all, of whatever race or nativity, in the states composing the Union, or in any territory, however acquired, over the inhabitants of which the government of the United States may exercise the powers conferred upon it by the Constitution."). *See also* Katherine Unterman, *Trial Without Jury in Guam, USA*, 38 Law & Hist. Rev. 811, 819-21 (2020) ("[J]ustifying the lack of jury trials by pointing to Guam's Spanish heritage was disingenuous, as in many other ways the American colonial administration was trying to erase the island's cultural traditions. . . . Dislike of juries, racism against local populations, and the desire

---

[6] Appellant's uncritical recitation of this pretext is unfortunate. *See* Appellant's Reply Br. at 12-13 (June 3, 2024).

for centralized governance all pointed in the same direction, each reinforcing the other."). The decision not to grant these rights in Guam "was based, at least in part, on ideas about the racial capabilities of Chamorus." *Id.* at 820.

[51]     In 1903, the Naval Governor of Guam wrote that "[t]he jury system, either grand or petit, as recognized in the United States, can not be carried out here. . . . [It] would be too much for the legal ability of this place [and] confusion would result, if not paralysis." *Id.* (footnote and internal quotation marks omitted). As one scholar has observed, "To the extent that the jury system is designed to interpose community sentiment between government and citizenry, it would have been unthinkable . . . to allow members of the indigenous territorial population to serve as jurors or grand jurors." *Id.* (quoting Stanley K. Laughlin, Jr., *The Law of United States Territories and Affiliated Jurisdictions*, 126 (Danvers, MA: Lawyers Cooperative Publishing, 1995)). The Bradley Bill of Rights, which was patterned after the first ten amendments to the Federal Constitution and ultimately served as a model for the Organic Act Bill of Rights, intentionally omitted the provisions for grand juries and jury trials. *Id.* at 819. This omission was justified as an act of cultural sensitivity, avoiding the imposition of "Anglo-Saxon" principles on the inhabitants of Guam. *Id.* (footnote omitted).

[52]     But "[f]rom the very start of American [naval] occupation, . . . the people of Guam pressed for greater rights and self-determination." *Id.* at 822. "In the hard-won Organic Act of 1950, Congress granted Guamanians United States citizenship and transitioned the island's government from military to civilian rule." *Id.* at 813. Although there was an Organic Act Bill of Rights, as stated above, it deliberately omitted the right to trial by jury and indictment by grand jury. *Id.* "Some Guamanians framed their lack of juries as a form of second-class citizenship and refused

to accept having what they perceived as fewer rights than United States citizens on the mainland had." *Id.* at 831. One statement in the Congressional Record is emblematic of this sentiment:

> Why should we be denied some of the rights which our fellow citizens are enjoying? . . . Are we not equally created? Or is there such a term as secondary citizenship? . . . The denial of the rights of indictment by a grand jury, and trial by jury are two excellent examples of denial of rights . . . to American citizens here in Guam.

*Id.* (quoting 98 Cong. Rec. H5700-01 (daily ed. May 21, 1952)) (internal quotation marks omitted).

[53]     From the passage of the Organic Act in 1950 until the creation of the Superior Court in 1974, all felonies—whether under Guam or federal law—were tried in the District Court of Guam. *See Agana Bay Dev. Co. (Hong Kong) v. Supreme Court of Guam*, 422 F. Supp. 593, 596 (D. Guam 1974), *rev'd on other grounds*, 529 F.2d 952 (9th Cir. 1976). This helps explain why the Organic Act first provided that the Federal Rules of Criminal Procedure applied to all criminal cases. *See* 48 U.S.C.A. § 1424(b) (1950); *Pugh v. United States*, 212 F.2d 761, 763 (9th Cir. 1954).

[54]     But because Federal Rule of Criminal Procedure 7(a) required indictment by a grand jury for all offenses punishable by more than a year of imprisonment, in 1954, the Ninth Circuit held that there was a right to a grand jury under the Organic Act for violations of federal and Guam law. *Pugh*, 212 F.2d at 763 (finding right to grand jury for violation of federal law); *Hatchett v. Gov't of Guam*, 212 F.2d 767, 772 (9th Cir. 1954) (finding right to grand jury for violation of Guam Penal Code). This caused great consternation because Guam had never had grand juries, and all prosecutions were brought by information. *See* Unterman, *supra*, at 835. Thus, every conviction after the passage of the Organic Act was subject to challenge, and "Congress realized that, unless it acted, the result would be 'a wholesale jail delivery of Guamanian convicts.'" *Id.* (footnote omitted).

[55]     Congress attempted to fix this oversight in August 1954 when it passed the Saylor Act,[7] which amended the Organic Act to read that Guam would follow the Federal Rules of Criminal Procedure "except that no provisions of any such rules which authorize or require trial by jury or the prosecution of offenses by indictment by a grand jury . . . shall be applicable to the District Court of Guam unless and until made so applicable by laws enacted by the Legislature of Guam." Saylor Bill, H.R. 8634, 83d Cong. (1954).   As Unterman concludes, "By allowing Guam's legislature to enact grand jury indictments and trial by jury, Congress was trying to pass off responsibility for a potential mass exodus of criminals from Guam's prisons.  Yet, for the first time in 55 years, it was also granting the people of Guam the power to decide for themselves what type of judicial system they wanted."  Unterman, *supra*, at 836.

[56]     In 1960, the Guam Legislature exercised its authority under the Organic Act to make indictment by grand jury applicable to the District Court.  *See* Guam Pub. L. 5-138:4 (Sept. 6, 1960); 64 Stat. 389-90.   Guam Public Law 5-138 required a grand jury in capital cases and provided they would be governed by the Federal Rules of Criminal Procedure.[8]  P.L. 5-138:2,4. Thus, although there seems to have been no differentiation between a "federal" or "local" grand jury, beginning in 1960, a defendant accused of first-degree murder in violation of the Guam Penal Code ("GPC") had the right to indictment by a grand jury empaneled by the District Court.[9]

[57]     In 1968, Congress passed the Mink Amendment, which extended the first nine amendments and Due Process Clause of the Fourteenth Amendment to Guam "to the extent that they have not

---

[7] The next year, the Ninth Circuit held that the Saylor Act was an unconstitutional ex post facto law as applied to defendants who committed crimes before the Saylor Act was passed. *Mafnas v. Gov't of Guam*, 228 F.2d 283, 286 (9th Cir. 1955).

[8] It also provided that grand juries were to consist of between 16 and 23 people.

[9] Before the death penalty was completely abolished in 1976, it was limited to murder of a police officer in 1966. *See* P.L. 08-148 (abolishing death penalty for first- and second-degree murder); Guam Penal Code § 191 (1970) (providing willful and malicious killing of law enforcement officer punishable by death).

been previously extended." 48 U.S.C.A. § 1421b(u). The Mink Amendment stated that those provisions "shall have the same force and effect there as in the United States or in any State of the United States." *Id.* The following year, the Ninth Circuit interpreted the Mink Amendment to mean:

> [E]ach of the constitutional provisions referred to in the section is to have the same effect in Guam as it would have in a state of the United States. Thus, the first nine amendments of the Constitution are made directly applicable to federal prosecutions in the territory, but are made applicable to prosecutions by the territorial government only to the extent that the rights guaranteed by these amendments are incorporated within the meaning of the [due process clause] of the Fourteenth Amendment.

*Guam v. Inglett*, 417 F.2d 123, 124 (9th Cir. 1969), *disapproved on other grounds by United States v. Frame*, 454 F.2d 1136, 1138 (9th Cir. 1972).

[58]    The Ninth Circuit held in *Inglett* that the Mink Amendment required grand jury indictment only in federal prosecutions because the right to indictment by a grand jury had not been incorporated against the states.[10] *Id.* It also found the legislative history of the Mink Amendment "reflect[ed] a congressional desire to extend to residents of Guam the same constitutional safeguards available to residents of the several states." *Id.* at 125. The court concluded the amendment was not meant to "deprive the Guam legislature of the power to determine whether offenses should be prosecuted by indictment or information." *Id.* at 124.

[59]    Between the time Inglett was convicted and his appeal was decided by the Ninth Circuit, the Guam Legislature exercised its power to determine that all felony offenses should be prosecuted by indictment. *See id.*; Unterman, *supra*, at 841 ("In 1969, the Guam Legislature

---

[10] The People fundamentally misunderstand the Fifth Amendment's application to Guam. Appellee's Br. at 37 ("These protections are enshrined through the Organic Act's incorporation of the Fifth Amendment as to Guam." (citing 48 U.S.C.A. § 1421b(u)).

introduced grand juries in felony cases." (footnote omitted)); P.L. 9-256 (Jan. 8, 1969). Public

Law 9-256 amended section 682 of the Guam Penal Code to read:

> An offense which may be punished by death shall be prosecuted by indictment. An offense which may be punished by imprisonment for a term exceeding one year shall be prosecuted by indictment or, if indictment is waived, it may be prosecuted by indictment or by information. Any other offense may be prosecuted by indictment or by information . . . .

P.L. 9-256:32. Public Law 9-256 also added a declaration that "[i]t is the policy of the territory of

Guam that all litigants in Guam courts entitled to trial by jury shall have the right to grand and

petit juries selected at random from a fair cross-section of the local community." Pub. L. 9-256:8.

This created the first "local" grand jury distinguishable from a "federal" grand jury summoned by

the District Court because the law now permitted misdemeanors to be prosecuted by indictment in

the Island Court.[11] All felony indictments were returned in the District Court and were governed

by the Federal Rules of Criminal Procedure, while misdemeanor indictments could be returned in

the Island Court and were governed by the Island Court's Rules of Criminal Procedure. However,

the process was no different between the two courts because the Island Court's rules mirrored the

federal rules, including Rule 6 regarding grand juries, Rule 7 regarding indictments, and Rule 17

regarding subpoenas. *See* GPC §§ 328-330, 338-339 (1970). Additionally, the new statutory

---

[11] Guam's Island Court saw several iterations. On July 15, 1910, the Spanish "Court of First Instance" formally become the Island Court. M. Dean Zenor, *United States Naval Government and Administration of Guam* (1949) (unpublished Ph.D. dissertation, University of Iowa) at 88. In 1933, the Island Court was reorganized under American law as a court of general jurisdiction over felonies and civil cases. *See id.* at 80; 89 ("It has original jurisdiction in all civil cases except those assigned by law to other courts, all probate matters, and criminal cases amounting to felonies."). Then after the Organic Act was passed in 1950, the Island Court was again reorganized, this time with jurisdiction over misdemeanors and civil cases having a value of less than $2,000. P.L. 1-017:82 (Aug. 9, 1951); *Gov't of Guam v. Kaanehe*, 137 F. Supp. 189, 191 (D. Guam App. Div. 1956) (discussing jurisdiction of Island Court).

scheme added by Public Law 9-256 for Guam's grand jury process codified Federal Rule of Criminal Procedure 6.[12]

[60] In 1974, the Guam Legislature created the Superior Court of Guam. P.L. 12-085 (Jan. 16, 1974). This act transferred jurisdiction over felony prosecutions under Guam law from the District Court to the Superior Court. The earliest reported cases from the Superior Court in the Guam Law Reports help clarify this transition. In *People v. Reyes*, the defendant challenged an indictment returned to the Island Court on June 28, 1974—three days before the Superior Court came into existence on July 1. *People v. Reyes*, Guam L. R. 247, 249 (1974). Reyes argued there was no statutory authority for him to be prosecuted in the Superior Court when the Island Court had empaneled the grand jury that indicted him. *Id.* The Superior Court held that "the Superior Court of Guam was in fact a continuation of the Island Court of Guam under a different name with additional jurisdiction," and, because the Island Court had the authority to empanel the grand jury, the indictment was valid. *Id.* at 252. The Superior Court concluded that the Island Court's Rules of Criminal Procedure remained in effect and became the rules of criminal procedure for the Superior Court of Guam. *Id.* In *People v. San Agustin*, the Superior Court held that to the extent the Rules of Criminal Procedure for the Island Court—which were now the rules applicable in the Superior Court—conflicted with the Guam Penal Code's Criminal Procedure statutes, the rules prevailed. *People v. San Agustin*, Guam L. R. 255, 256-57 (1974).

[61] "By 1975, the attorney general of Guam referred to indictment by a grand jury and trial by jury as 'rights [that] are cherished by all Guamanians.'" Unterman, *supra*, at 841 (footnote

---

[12] The law added seven procedural sections: § 804 (Summoning Grand Juries), § 805 (Objections to Grand Jury and Jurors), § 805.1 (Foreman and Deputy Foreman), § 805.2 (Who May Be Present), § 805.3 (Secrecy of Proceedings), § 805.4 (Finding and Return of Indictment), and § 805.5 (Discharge and Excuse). P.L. 9-256:40. Each of these provisions codified a different subsection of Federal Rule of Criminal Procedure 6: 6(a) (Summoning Grand Juries); 6(b) (Objections to Grand Jury and to Grand Jurors.); 6(c) (Foreman and Deputy Foreman); 6(d) (Who May be Present); 6(e) (Secrecy of Proceedings and Disclosure); 6(f) (Finding and Return of Indictment); and 6(g) (Discharge and Excuse). *Compare* P.L. 9-256:40, *with* Fed. R. Crim. P. 6, 18 U.S.C. Appendix 4484-85 (1970).

omitted).  In 1976, the Legislature enacted Public Law 13-186, which modified the grand jury

process to adopt a hybrid of the Federal Rules of Criminal Procedure and California's Code of

Criminal Procedure.  *See* P.L. 13-186:1 (Sept. 2, 1976); 8 GCA Ch. 50, Note.  The introduction to

the 1977 publication "Criminal Procedure and P.L. 13-187" explained:

> The Criminal Procedure Code (P.L. 13-186) supersedes Part II of the Penal
> Code of Guam [Criminal Procedure] and existing, court-adopted, Rules of Criminal
> Procedure.  The Law Revision Commission, having observed the interaction (and
> confusion) between Part II of the Penal Code and the Rules of Criminal Procedure,
> decided that all major criminal rules should be in statutory form.  Thus, these Rules
> are intended to wholly supersede existing Rules of Criminal Procedure.  It is for
> this reason that no "Rules of Criminal Procedure" adopted by the Court have been
> attached to this Volume.  Those rules which the Court may adopt have not yet been
> adopted.

Title 8 GCA, 2007 Comment.  Authored by the Compiler of Laws, the introduction also stated that

"[e]ven a cursory examination will reveal that the Criminal Procedure Code, as adopted, makes

significant changes.  Yet this Code is not designed to cause a revolution in Criminal Procedure,

only rapid evolution.  Special attention should be directed towards the areas of pre-trial release,

*grand jury proceedings*, preliminary examinations, depositions and discovery."  *Id.* (emphasis

added).

[62]     The explanatory note added by the Compiler states that the new grand jury chapter was

"based on former Rule 6 and former §§ 804-805e.  However, a number of changes have been made

to conform to recent revisions of Rule 6 of the Federal Rules of Criminal Procedure and to

incorporate certain features of the California law relating to grand jury proceedings."  8 GCA Ch.

50, Note.  Public Law 13-186 inserted the phrase "felonies and related misdemeanors" into the

section governing crimes that could be prosecuted by indictment and into a new subsection

defining the role of a grand jury.  P.L. 13-186:1 ("1.15.  Any felony together with any related

misdemeanor shall be prosecuted by indictment . . . .  Any other offense shall be prosecuted by

complaint."); *id.* ("50.10. (a) A grand jury is a body of the required number of persons summoned by the court and sworn to inquire into felonies and any related misdemeanors triable by the court."); *see also* 8 GCA § 50.10, Note ("Section 50.10(a) is simply an introductory provision based on § 888 of the California Penal Code.").

[63] Except for a handful of amendments, the scheme enacted by Public law 13-186 remains in place today. For example, Public Law 15-94 lowered the bar for evidence presented to grand juries from what was admissible at trial to "competent evidence." Pub. L. 15-94:7 (Jan. 17, 1980). Public Law 15-94 also created a new section regarding grand jury subpoenas, now codified at 8 GCA § 75.45.[13] P.L. 15-94:9. The Compiler's Note explains:

> New § 75.45 was added to fill a statutory gap of long standing. It has been assumed that the Attorney General has the power to issue subpoenas, or rather request the clerk of the court to issue subpoenas for witnesses before the grand jury. This Section cleans up the administrative process by permitting the Attorney General to issue and sign all subpoenas for grand juries.

8 GCA § 75.45, Note (2005).

[64] Thus, the legislative history of the adoption of grand juries in Guam shows it mirrors our unique history of development in the judicial branch. After the enactment of the Organic Act, the District Court presided over federal and local felony cases and empaneled grand juries with the power to investigate and indict under the common law and federal rules. In 1969, grand juries were created in the Island Court, substantively governed by the federal rules. When the Legislature created the Superior Court and cemented the Judiciary of Guam as a branch of the Government of Guam, it perpetuated the use of grand juries under the federal rules. When the Legislature

---

[13] This can hardly be considered the first time a Guam grand jury had subpoena power. From 1969 to 1974, grand juries empaneled by the Island Court in misdemeanor cases had the subpoena power under the Island Court's Rules of Criminal Procedure, which mirrored the federal rules. And from 1974 to 1976, all Guam grand juries empaneled by the Superior Court were governed by these same rules. As discussed below, it strains credulity to believe that because Public Law 13-186 remained silent on the subpoena power, the Legislature intended to create a four-year interregnum where Guam grand juries were powerless to issue subpoenas.

incorporated California law into the Guam grand jury process, it was not working with a blank slate: it was modifying the federal procedure that had been followed for the prior seven years in the local courts of Guam.

### 3. Although grand juries in Guam were created by statute, those statutes adopted the common law

[65]    Appellant relies on a selective reading of Guam history to support the argument that a Guam grand jury has no authority to investigate unless it is first presented with a proposed indictment outlining a specific felony. *See* Appellant's Reply Br. at 4-10 (June 3, 2024); RA, tab 10 at 2 (Reply Opp'n Mot. Quash).  Appellant argues that when the Legislature adopted a modified version of CPC § 888, it was abrogating the common law and creating a grand jury with narrower authority than those in California.  *See* Appellant's Br. at 29-30 (comparing language of CPC § 888 with 8 GCA § 50.10).  Appellant argues that Guam grand juries are creatures of statute with only those powers granted to them by statute.  *Id.* at 1.

[66]    The major flaw in Appellant's argument is that they fail to recognize that when Public Law 13-186 was passed in 1976, the local courts of Guam had been conducting grand juries under the procedure outlined by the Federal Rules of Criminal Procedure for nearly seven years.  Public Law 13-186 did not create a new grand jury scheme—it modified the existing one, which was a carbon copy of the federal grand jury system.  And the federal grand jury system is based on the adoption of the grand jury as it existed at common law.  *In re Apr. 1956 Term Grand Jury*, 239 F.2d at 268 ("The Fifth Amendment adopted the grand jury, as it existed at common law, and thereby made it a part of the fundamental law of the United States for the prosecution of crime.  No part of the constitution defines the grand jury.  No act of congress has ever attempted such a definition.  It had its origin in the common law and has existed for many hundred years." (footnote omitted)).

**[67]**     Although grand juries in Guam can technically be considered creatures of statute, this "cannot be dispositive of the matter." *Cf. Antolin*, 216 Cal. Rptr. 3d at 352 ("The Determinate Sentencing Law is 'wholly statutory,' but there is no dispute that the common law rule regarding jurisdiction to modify sentences applies to state prison sentences imposed pursuant to this statutory scheme, except to the extent that a statute specifically provides otherwise."). The right to indictment by grand jury is also statutory in Virginia, yet their Supreme Court has held that their grand jury system is founded on the English common law. *Reed v. Commonwealth*, 706 S.E.2d 854, 858 (Va. 2011). And the Supreme Court of New Hampshire, where grand jury indictment is statutory, has likewise held that "[i]n New Hampshire, the grand jury's 'common law powers are not restricted.'" *State v. Blake*, 305 A.2d 300, 303 (N.H. 1973) (citation omitted).

**[68]**     Adopting Appellant's interpretation would mean that when the Legislature passed Public Law 9-256, it intended to create grand juries in the Island Court with no substantive powers—because no statute authorized issuing subpoenas, presenting evidence, or examining witnesses. *See* P.L. 9-256:40; *see also, e.g.*, *In re Meeting of Grand Jury for Fourth Quarter, 1984*, 497 N.E.2d 1088, 1089 (Ind. Ct. App. 1986) (stating that Indiana "grand jury proceedings are strictly statutory and grand juries have no common-law powers"). *But see Gilmore v. State*, 98 N.E.2d 677, 679 (Ind. 1951) ("[S]election, impaneling, swearing, instruction, rights, powers and duties [of a grand jury] are largely governed by statute. However, when cases not governed by the statute arise, resort may be had to the common law principles as declared by the courts of this state, as well as other states, for guidance.").

**[69]**     The only logical conclusion is that, in 1969, when the Legislature created "local" grand juries that could be empaneled by the Island Court, it was adopting the common law. *See People v. Taisacan*, 2023 Guam 19 ¶ 21 (stating the legislature "legislates against the backdrop of existing

law" (quoting *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019))); *cf. Damian v. Damian*, 2015 Guam 12 ¶ 65 (observing the legislature codified common law doctrine of res judicata); *A.B. Won Pat Guam Int'l Airport Auth. ex rel. Bd. of Dirs. v. Moylan*, 2005 Guam 5 ¶ 62 (per curiam) (noting 5 GCA § 30103 "states that the Attorney General has common law powers except as limited by statute"). We conclude that Public Law 9-256 adopted the common law grand jury that existed in the federal courts for prosecutions brought under Guam law. Public Law 9-256 required that felonies be indicted by a grand jury empaneled by the District Court, and it permitted misdemeanors to be indicted by grand juries empaneled by the Island Court—with both grand juries governed by substantively the same rules and enjoying the same powers.

[70] The creation of the Superior Court in 1974 did not abolish the use of common law grand juries in local prosecutions; it merely transferred these common law felony grand juries from the District Court to the Superior Court. We conclude that the continuation of the Island Court's power to empanel misdemeanor grand juries in the Superior Court, coupled with transferring felony grand juries from the District Court to the Superior Court, perpetuated the use of common law grand juries in prosecutions under Guam law.

### 4. Guam's grand jury statutes alter the common law but do not abrogate it

[71] The Guam Legislature has the power to alter the common law. *See Guam Greyhound, Inc. v. Brizill*, 2008 Guam 13 ¶ 18; *People v. John*, 2016 Guam 41 ¶ 59 n.3. Unlike many jurisdictions, in Guam, statutes in derogation of the common law are *not* strictly construed. 1 GCA § 700 (2005). This rule of construction is based on California law. *Id.*, Source (citing former Guam Code Civ. P. § 4, former Guam Civil Code § 4, and former Guam Penal Code §§ 4-5, which were adapted from the California codes of the same name). However, California courts have explained that while they must construe the Code "liberally and with a view to effect its objects and promote

justice," *Herbert Hawkins Realtors, Inc. v. Milheiser*, 189 Cal. Rptr. 450, 452 (Ct. App. 1983), "where the code is silent, the common law governs," *Lacher v. Superior Court*, 281 Cal. Rptr. 640, 646 (Ct. App. 1991). The California Court of Appeal has explained that:

> [a]s a general rule, unless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules. A statute will be construed in light of common law decisions, unless its language clearly and unequivocally discloses an intention to depart from, alter, or abrogate the common-law rule concerning the particular subject matter. . . . Accordingly, there is a presumption that a statute does not, by implication, repeal the common law. Repeal by implication is recognized only where there is no rational basis for harmonizing two potentially conflicting laws.

*Antolin*, 216 Cal. Rptr. 3d at 352 (alterations in original) (citations and internal quotation marks omitted).

[72]     Stated another way, "[t]he common law is not repealed by implication or otherwise, if there is no repugnancy between it and the statute, and it does not appear that the legislature intended to cover the whole subject." *Lacher*, 281 Cal. Rptr. at 646 (citations omitted). This court has found California law to be persuasive on this topic, observing:

> The general rule is that statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject or, in other words, to occupy the field. "[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described, indicates a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter."

*Pangelinan v. Camacho*, 2008 Guam 4 ¶ 5 n.9 (alteration in original) (quoting *I.E. Assocs. v. Safeco Title Ins. Co.*, 702 P.2d 596, 598 (Cal. 1985)).

[73]     As a starting point, we presume that Public Law 13-186 did not repeal the common law by implication. Public Law 13-186 amended the grand jury scheme to incorporate provisions from California law into a process that had previously mirrored the federal common law approach. Appellant argues that "the specific law conferring the grand jury's power in Guam is based on

corresponding California law," and seems to assume that the common law authority of California grand juries was abrogated by statute. *See* Reply Br. at 4, 15. But this is incorrect: California, like a majority of jurisdictions in the United States, adopted grand juries as they existed at common law. *People ex rel. Pierson v. Superior Court*, 212 Cal. Rptr. 3d 636, 641 (Ct. App. 2017) (holding that California incorporated institution of criminal grand jury as known at common law). And under California law, without a statute clearly and unequivocally to the contrary, a criminal grand jury retains its common law powers, such as the power to issue subpoenas *duces tecum*, "even though the Legislature did not grant this procedural power explicitly." *Id.* at 643.

[74] The argument that the combining of two common law grand jury processes—federal and California—somehow resulted in a wholesale repeal of the common law is unpersuasive. This is especially salient on the point of a grand jury's subpoena powers. If we accepted Appellant's interpretation, it would mean that from 1976 to 1980, the Legislature intended for Guam grand juries to have no subpoena power. In all likelihood, this would have been the first and only grand jury in the history of the United States lacking the power to compel witness testimony. *See Kastigar*, 406 U.S. at 443 (observing that over three decades before American independence, it was considered an "indubitable certainty" that grand juries had the "right to every man's evidence" (citation omitted)); *see also* Beale et al., *supra*, § 6:3 ("Grand juries have universally been accorded the power to compel witnesses to testify before them, and to obtain physical evidence by subpoena as well."); Beale et al., *supra*, § 6:1 ("Grand juries in every jurisdiction have the power to compel witnesses to testify and to produce evidence. . . . The importance of the subpoena power to an effective investigative system is perhaps best demonstrated by the fact that those states that have devised alternative systems of investigating criminal conduct have all preserved the subpoena power as a key feature of the system."). We cannot conclude that such an absurdity was intended,

and we therefore hold that a repeal of the common law was not the Legislature's intent. Instead, the statutory scheme enacted by Public Law 13-186 can be reconciled with the common law, especially where the statutes are silent. Generally, the common law and Guam's statutory grand jury scheme can be harmonized. The Legislature did not intend to cover the whole subject of grand jury procedure and substantive powers. We conclude that Public Law 13-186 did not totally supersede and replace the common law dealing with grand juries.

### a. When the Guam Legislature passed 8 GCA § 50.10, it altered the common law grand jury but did not abolish it

[75]    The plain language of 8 GCA § 50.10 limits grand jury inquiries in Guam to felonies and related misdemeanors. This is narrower than the authority of federal grand juries that follow the common law. *E.g.*, *In re Grand Jury Investigation of Shipping Indus.*, 186 F. Supp. 298, 317 (D.D.C 1960) ("We regard the converse of the fifth amendment to be that persons may be held to answer for crimes other than such as are capital or infamous upon information *or indictment*, according to the course of the common law." (emphasis added) (citation omitted)). This is also different than the authority possessed by grand juries empaneled by the Island Court to inquire into misdemeanors or empaneled by the Superior Court before passage of Public Law 13-186. But this alteration of the common law is not so unique as Appellant makes it out to be.

[76]    Much of Appellant's argument hinges on the difference between the language in the Guam and California provisions. *See, e.g.*, Reply Br. at 6. The language of 8 GCA § 50.10(a) states that grand juries are sworn to inquire "into felonies and any related misdemeanors triable by the court," while CPC § 888 reads "of public offenses committed or triable within the county." The argument that this change in language was intended as a wholesale repeal of the common law that requires a proposed indictment be presented before a grand jury can perform an inquiry is unconvincing.

**[77]** First, we have recognized that a grand jury can inquire to satisfy itself that no crime occurred. "Unlike [a] [c]ourt, whose jurisdiction is predicated upon a specific case or controversy, the grand jury 'can investigate merely on suspicion that the law is being violated, or even because it wants assurance that it is not.'" *People v. San Nicolas*, 2016 Guam 21 ¶ 15 n.7 (alterations in original) (quoting *Williams*, 504 U.S. at 48 (quoting *R. Enters.*, 498 U.S. at 297)). We also find persuasive the Supreme Court's statement in *R. Enterprises* that "[t]he function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." 498 U.S. at 297; *see also In re Special Investigation Misc. 1064*, 275 A.3d 354, 383-84 (Md. 2021) (applying *R. Enterprises* for subpoenas issued by grand jury created by statute). Even assuming the Legislature intended to narrow Guam grand jury inquiries to be less than those in California, a grand jury inquiry is proper if the purpose is to satisfy itself that no felony has occurred.

**[78]** Despite different language, the indictment powers of Guam and California grand juries are functionally the same. An indictment is defined by 8 GCA § 50.54(a) as "an accusation in writing, presented by the grand jury to a competent court, charging a person with a felony *or* a felony and a related misdemeanor." 8 GCA § 50.54(a) (as amended by P.L. 29-042:1 (Jan. 2, 2008)). This differs from the language of CPC § 889, which instead uses the words "public offense." However, both 8 GCA § 1.15 and CPC § 740 require that, unless appended to felony charges, misdemeanors must be tried by complaint. *People v. Lukenbill*, 285 Cal. Rptr. 461, 462 (App. Dep't Super. Ct. 1991) ("Three California Supreme Court cases . . . clearly hold that a grand jury indictment charging only misdemeanors cannot be returned." (citations omitted)). Although the Guam Code Annotated uses language different from the California Penal Code, in practice, they reach the same

results: a grand jury cannot return an indictment charging only misdemeanors.[14]

[79]     Guam and California are not the only jurisdictions that have prohibited their grand juries from indicting free-standing misdemeanors. Grand juries in Mississippi are prohibited from indicting misdemeanors, yet their Supreme Court has rejected a challenge similar to the one raised by Appellant here. *See Entergy Miss., Inc. v. State*, 132 So. 3d 568, 577 (Miss. 2014) ("The possibility that a state law was being violated gave the grand jury ample authority to investigate and renders the subpoena nonarbitrary. . . . It matters not that there was no particularized suspicion of individuals . . . ." (footnote omitted)). Alabama, which also limits grand juries to felony indictments, likewise seems to have endorsed expansive grand jury investigatory powers. *See Ex parte Gonzalez*, 686 So. 2d 204, 206 (Ala. 1996) (per curiam) ("Unlike a court, which needs a case or controversy in order to have jurisdiction, the grand jury can investigate on a mere suspicion that a law is being violated or to assure that it is not being violated." (citation omitted)).

[80]     We cannot say that changing the words "public offense" to "felonies and any related misdemeanors" reveals a clear and unequivocal intention to abrogate the entire common law about grand juries. *See Antolin*, 216 Cal. Rptr. 3d at 352. Appellant cites no example from any American jurisdiction of a grand jury process—either constitutional, statutory, or common law—that requires disclosure of proposed charges and the defendant's identity before the grand jury begins its inquest.

---

[14] Although not essential to our holding, we note that these seem to be minor changes in phraseology that are neither material nor substantive. *See Davis Mem'l Hosp. v. W. Va. State Tax Comm'r*, 671 S.E.2d 682, 692-93 (W. Va. 2008) ("[T]he adoption of a modified version of another jurisdiction's statute merely creates a *presumption* that a change was intended. Moreover, it appears that minor changes to a statutory scheme do not carry the same weight as more significant changes: 'where *material and substantive changes* are made by the Legislature in adopting a federal statute the presumption that the Legislature intended to accomplish the same purposes and objectives as the Congress is no longer valid.'" (citation omitted)); *Copper Queen Consol. Mining Co. v. Territorial Bd. of Equalization*, 84 P. 511, 513 (1906) (holding where legislature adopts statute from laws of another state, it will be presumed to have also adopted construction given to statute prior to adoption by court of last resort of that state, unless it makes a "change of phraseology" which necessitates a change of construction (citation omitted)), *aff'd sub nom. Copper Queen Consol. Mining Co. v. Territorial Bd. of Equalization of Territory of Ariz.*, 206 U.S. 474 (1907). The Guam Legislature altered the common law in a way that mirrors California law, rather than differs from it. The Legislature merely used more precise language and did not require a cross-reference to another provision of law to determine whether "public offenses" include free-standing misdemeanors.

Although this may often be the better practice, we cannot say this is a jurisdictional prerequisite. The lack of a specific charge pending against a particular person before the grand jury does not affect its subpoena power.

[81]     This is a point on which both California and the federal courts agree: "Because the grand jury is an investigative body, 'the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning,' at least in theory." *People v. Petrilli*, 172 Cal. Rptr. 3d 480, 486 (Ct. App. 2014) (quoting *Blair v. United States*, 250 U.S. 273, 282 (1919)). California courts have adopted *Blair* on this point:

> [T]he proper scope of a grand jury investigation . . . "is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning."

*Roman Cath. Archbishop of L.A. v. Superior Court*, 32 Cal. Rptr. 3d 209, 241 (Ct. App. 2005) (quoting *M.B. v. Superior Court*, 127 Cal. Rptr. 2d 454, 462-63 (Ct. App. 2002)).

[82]     Over 100 years ago, the U.S. Supreme Court held in *Hale* that the grand jury's subpoena power was not limited to situations in which a "specific 'charge' [was] pending before the grand jury against any particular person," and that jurors were sworn to "diligently inquire" into all matters that came to their knowledge during their service. 201 U.S. at 59-60. California has also adopted a similar rule, holding that "[i]t is not necessary that formal charges of specific offenses shall first be made against particular named individuals to authorize a grand jury to institute an investigation thereof." *Samish v. Superior Court*, 83 P.2d 305, 306 (Cal. Ct. App. 1938).

[83]     In *Samish*, the California Court of Appeal explained that "[a] grand jury is not deprived of jurisdiction to investigate asserted public offenses merely because its members are uncertain as to

whether a crime was actually committed . . . or because of a lack of identity of the particular individual who perpetrated the crime." *Id.* The court reasoned that if a grand jury investigation failed to reveal an indictable crime, "that does not render the proceedings invalid or void, but merely precludes the presenting of an indictment." *Id.* The court emphasized that "[o]f course, investigations of grand juries should be conducted in good faith with reasonable cause to believe that they possess jurisdiction to inquire into the asserted offenses." *Id.* But it concluded that "when grand jurors . . . are furnished with reliable information indicating that a crime has been committed . . . , it is the duty of the grand jury to fearlessly and fairly investigate the charges and indict the culpable party if the evidence warrants that finding." *Id.* at 306-07; *see also* 3 LaFave et al., *supra*, § 8.8(b) ("[S]tate courts generally, similar to *R. Enterprises*, emphasize that grand jury investigations do not need an individualized criminal offense foundation, which allows for a broad subject of investigation and thereby expands the range of potentially relevant transactions." (footnote omitted)); *In re May 1991 Will Cnty. Grand Jury*, 604 N.E.2d 929, 935 (Ill. 1992) ("Because it is not necessary that specific charges be pending before the grand jury as a condition of its right to subpoena written materials, the usual trial standards do not apply to grand jury subpoenas *duces tecum* for documents; 'the most that can be required as a standard of materiality is as precise a statement of the subject under investigation as the circumstances permit.'" (citation omitted)).

[84]    Somewhat understandably, there is confusion about the parties' references to "investigatory" and "indicting" grand juries throughout this case. *See* Appellant's Br. at 36-46. The informal language first used by the People in the SDT to appear and testify before the "Investigative Grand Jury" did not help matters. *See* 3 LaFave et al., *supra*, § 8.1(a) (observing that, in indictment jurisdictions, prosecutors in large communities will informally designate

"indicting" grand juries that screen investigated cases and "investigative" grand juries that perform investigations before shifting to the role of screening and indicting). The grand jury as adopted in the United States generally had the dual functions of the traditional grand jury: the power to both investigate and indict. In trying to distinguish between "investigatory" and "indicting" grand juries, Appellant cites cases from Pennsylvania and Connecticut, the only two jurisdictions that have abolished the power of their grand juries to return indictments. In those jurisdictions, there is a bright line between an "indicting" and "investigating" grand jury. As explained in a leading treatise, "[i]nvestigating, as distinct from indicting, grand juries do not even accuse but only inquire and report." 38A C.J.S. *Grand Juries* § 1. The Connecticut Supreme Court has stated: "What distinguishes an investigating from an indicting grand jury is that '[g]rand-juries [of the indicting type] do not *try*, but *enquire*; they do not *condemn*, but only *accuse* . . . .' Investigating grand juries neither *try* nor *condemn* nor *accuse;* they only *inquire* and *report*." *In re Final Grand Jury Rep. Concerning Torrington Police Dep't*, 501 A.2d 377, 381 (Conn. 1985) (alterations in original) (citations omitted). Thus, while both "investigatory" and "indicting" grand juries inquire, the former can only report because it lacks the power to indict. Under American law, all grand juries—whether characterized as "indicting" or "investigatory"—have the authority to make some inquiry.

[85]    Appellant argues that Guam's grand jury statutes do not allow presentments or any other "generalized investigations" that extend "beyond the felonies and related misdemeanors identified" in a proposed indictment. *See* Appellant's Br. at 43; *see also* RA, tab 18 at 3 (Dec. & Order) ("[Appellant] contrasts these statutes with Title 8, Chapter 50, of the Guam Code, and specifically section 50.10(a), which does not allow presentments or any investigation other than those related to inquiries into felonies."). Although American grand juries have a rich history of

making presentments and authoring reports, today, "[s]tate and federal courts [are] divided as to whether the grand jury has a 'common law authority' to issue reports in the absence of specific legislative authorization." 3 LaFave et al., *supra*, § 8.3(h) (footnote omitted). As LaFave notes, "the elimination of the presentment in the federal system and a number of states" has undercut "the retention of the grand jury's common law inquisitorial authority." *Id.* § 8.4(b) (footnote omitted). But Guam's adoption of the grand jury as it existed in federal law allows us to sidestep any complicated questions about the intersection of presentments and investigatory power. Despite the Federal Rules of Criminal Procedure curtailing grand jury presentments, federal courts uniformly hold that federal grand juries retain common law investigatory powers. *See United States v. Christian*, 660 F.2d 892, 900-02 (3d Cir. 1981).

[86]     Guam has specific statutory authority by which grand juries can make formal accusations. Although it may ultimately uncover no crime, a Guam grand jury's investigation can still be justified by the possibility that it might have resulted in criminal charges; indeed, the Guam "grand jury's broad investigative power [is tied] to its ultimate decision whether to accuse a suspect of a crime." *See id.* at 901. Because the Guam grand jury can indict, it serves an "effective accusatorial purpose," and we need not reach whether it can present or otherwise author a report to determine it has investigatory power. *See id.* at 902.

### b. Other provisions of the statutory scheme do not express a clear intent to replace the common law and require a proposed indictment from the outset of the grand jury's inquiry

[87]     Appellant argues that 8 GCA § 50.30 confirms "[t]he fact that proposed charges or a bill of indictment must be presented to a Guam grand jury at the outset of its inquiry, and not at the end." Appellant's Br. at 26. That section requires:

> Before considering a charge against any person, the prosecuting attorney shall state to those present the matter to be considered and the person to be charged

with an offense in connection therewith. He shall request any member of the grand jury who has a state of mind in reference to the case or to any party which will prevent him from acting impartially and without prejudice to the substantial rights of the party to retire.

8 GCA § 50.30 (2005). But section 50.30 is based on CPC § 939.5,[15] and as discussed above, California courts do not require proposed charges to be presented to the grand jury at the outset of its inquiry. Instead, California recognizes that the target of a grand jury inquiry is not always identifiable. *See Petrilli*, 172 Cal. Rptr. 3d at 487 ("A person who is the target of a grand jury inquiry, *even if identifiable*, has no right to be present or to be represented by counsel at grand jury proceedings, to refuse to appear as a witness before the grand jury, or to produce witnesses on his or her own behalf." (emphasis added)). Arguably, section 50.30 is ambiguous: if a defendant can be identified, then the prosecuting attorney must ask jurors who are not impartial to retire. The statute should be construed under common law decisions like *Blair* that the identity of the offender is normally developed at the end of the grand jury's labors. *See* 250 U.S. at 282. Its language does not "clearly and unequivocally disclose[] an intention to depart from, alter, or abrogate the common-law rule concerning the particular subject matter." *See Antolin*, 216 Cal. Rptr. 3d at 352 (citations omitted).

[88] We conclude that the Superior Court applied the correct legal standard. The trial court correctly concluded that under 8 GCA § 50.10(a), Guam grand juries are to inquire into felonies and related misdemeanors. This was an alteration of the common law about this specific principle relating to grand juries, but it was not a complete abrogation of the common law grand jury adopted by the Guam Legislature. Unlike common law grand juries, Guam grand juries cannot return an indictment for only misdemeanors. But the contention that proposed charges must be presented to

---

[15] These two sections do differ in that CPC § 939.5 puts this responsibility on the foreman of the grand jury, while 8 GCA § 50.30 requires the prosecuting attorney to do so. Like the discussion above, this cannot reasonably be construed as repealing the common law.

the grand jury at the outset of its inquiry is unsupported by law. The grand jury is not a body sworn to inquire into indictments. Guam grand juries can inquire into all information that might bear on its investigation until it has identified a felony or has satisfied itself that none has occurred.

[89]    Although requiring the prosecution to present a proposed indictment at the outset of grand jury proceedings or limiting the investigatory powers of the grand jury may be salutary changes, they "would run counter to the whole history of the grand jury institution." *Williams*, 504 U.S. at 50 (citation omitted). Such changes must come from the Legislature. The language of our current grand jury statutes simply does not clearly and unequivocally disclose an intention to depart from, alter, or abrogate the common law.

## B. The Trial Court Did Not Abuse Its Discretion in Denying the Motion to Quash

[90]    "A trial court's ruling on a motion to quash a subpoena *duces tecum* is reviewed for an abuse of discretion." *Responsible Choices for All Adults Coal.*, 2007 Guam 20 ¶ 91 (citations omitted). "[A] court abuses its discretion by basing its decision on an erroneous legal standard or clearly erroneous factual findings, or if, in applying the appropriate legal standards, the court misapprehended the law with respect to the underlying issues in the litigation." *Faisao*, 2018 Guam 26 ¶ 12 (quoting *Mallo*, 2008 Guam 23 ¶ 56). We conclude the trial court based its decision on the correct legal standard. Appellant's attempt to distinguish federal law is especially unpersuasive on this final issue.

[91]    Under federal and California law, "a grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." *M.B.*, 127 Cal. Rptr. 2d at 463 (quoting *R. Enters.*, 498 U.S. at 300-01). And California has adopted the *R. Enterprises* standard that "[a] grand jury subpoena permits the government to obtain documents unless 'there is no reasonable possibility that the

category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation.'" *State Water Res. Control Bd. v. Baldwin & Sons, Inc.*, 258 Cal. Rptr. 3d 425, 436 n.18 (Ct. App. 2020) (quoting *R. Enters.*, 498 U.S. at 301). Because Guam has adopted a hybrid of the California and federal grand jury processes, we find *R. Enterprises* to be highly persuasive on this issue and adopt it as the standard that applies in Guam to grand jury challenges. *See* 3 LaFave et al., *supra*, § 8.8(b) (footnotes omitted) ("*R. Enterprises* is not a constitutional ruling, and the states are free to adopt a different approach on the relevancy issue. However, among the relatively small group of state courts that have addressed the issue, though some place a limited burden on the prosecution to show possible relevancy, most have either specifically adopted the *R. Enterprises* standard, or adopted (without discussing *R. Enterprises*) an approach that similarly requires a challenging party to show no possible relevance.").

[92]    We conclude the Superior Court did not err in applying the *R. Enterprises* standard to Appellant's challenge. The trial court's finding that Appellant did not rebut the evidentiary presumption that the subpoena was reasonable is a factual finding reviewed for substantial evidence. *See In re Guardianship of Moylan*, 2018 Guam 15 ¶ 6 ("A finding of fact is clearly erroneous where it is not supported by substantial evidence, and this court is left with a definite and firm conviction that a mistake has been made." (quoting *M Elec. Corp.*, 2016 Guam 35 ¶ 41)); *cf. Estate of Auen*, 35 Cal. Rptr. 2d at 564 (reviewing finding that appellants failed to rebut presumption of undue influence for substantial evidence); *N.T. Enloe Mem'l Hosp. v. N.L.R.B.*, 682 F.2d 790, 795 (9th Cir. 1982) (reviewing finding that employer failed to rebut presumption of union's majority status for substantial evidence).

[93]    Appellant's argument misapprehends who bore the burden of showing the subpoena was unreasonable or oppressive.  As the U.S. Supreme Court observed, "[i]t seems unlikely, of course, that a challenging party who does not know the general subject matter of the grand jury's investigation, no matter how valid that party's claim, will be able to make the necessary showing that compliance would be unreasonable."  *R. Enters.*, 498 U.S. at 301.  Therefore, "a court may be justified in a case where unreasonableness is alleged in requiring the Government to reveal the general subject of the grand jury's investigation before requiring the challenging party to carry its burden of persuasion."  *Id.* at 302.

[94]    That occurred here, and the Superior Court found the People had revealed the general subject matter of the investigation to be "wrongdoing in the [Appellant's] procurement activities." RA, tab 18 at 5 (Dec. & Order).  Appellant challenges the manner of how the People disclosed the subject matter of the investigation but does not seem to acknowledge that Appellant had the burden to rebut the presumption that the subpoena was reasonable.  Appellant seems to make two challenges to how the People disclosed the subject matter of the investigation: that it was not based on "competent" evidence and that the statements were "unsworn."  Appellant's Br. at 33.  Although poorly developed, these seem like oblique references to 8 GCA § 50.42's requirement that "only competent evidence" be received by the grand jury and *Schofield* affidavits, respectively.

[95]    The first challenge can be rejected quickly.  By its plain language, section 50.42 applies to evidence received by the grand jury.  8 GCA § 50.42 (2005).  It has no application in proceedings to quash a subpoena.  In *R. Enterprises*, the Supreme Court left it to the district courts "to craft appropriate procedures that balance the interests of the subpoena recipient against the strong governmental interests in maintaining secrecy, preserving investigatory flexibility, and avoiding procedural delays."  498 U.S. at 302.  Appellant cites no case in the intervening 30 years that has

required a prosecutor to provide "competent evidence" regarding the subject of a grand jury investigation.

[96]    Although some state courts "place a limited burden on the prosecution to show possible relevancy," 3 LaFave et al., *supra*, § 8.8(b) (footnote omitted), none have required competent evidence, *see, e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 401 A.2d 258, 258-59 (N.J. Super. Ct. App. Div. 1979) (per curiam) (where a grand jury subpoena is challenged as to relevancy, "all that need be shown by the State is that the documents subpoenaed 'bear [s]ome possible relationship, however indirect, to the grand jury investigation'" after identifying "the nature and subject matter of that investigation," which does not require an "affidavit or other formal proofs, but may be satisfied by simple representation by counsel to the court" (citation omitted)); *Pignatiello v. District Court*, 659 P.2d 683, 685-86 (Colo. 1983) (en banc) (noting the need for a "showing that a relationship exists between the documents which must be produced and the purposes of the inquiry," but adding this requirement can be met by the court conducting an *in camera* inquiry, which does not require a document-by-document review, or by the court based on its knowledge of the grand jury investigation (citation omitted)).  On the other hand, the Kansas Supreme Court seems to have endorsed an informal approach to disclosure: "Consistent with the procedure described in *R. Enterprises*, if necessary, the judge may require the prosecuting attorney to share with the court, *in camera*, the nature of the information the grand jury is seeking . . . ." *Tiller v. Corrigan*, 182 P.3d 719, 727 (Kan. 2008).

[97]    We agree with an informal approach to disclosure.  What was done here—stating the general subject of the grand jury investigation in the body of a motion and in open court during a hearing—satisfied the *R. Enterprises* procedure.  *See In re Grand Jury Subpoena Duces Tecum*,

401 A.2d at 258 (holding New Jersey procedure "may be satisfied by simple representation by counsel to the court" (citation omitted)).

### 1. We reject a *Schofield* affidavit requirement

[98]    Additionally, although Appellant emphasizes the representations about the subject matter of the investigation were "unsworn," there is no meaningful engagement with *Schofield* affidavits.[16] *See* Appellant's Br. at 3, 14, 21, 33, 35, 46, 48-49.  A minority of jurisdictions require that when a grand jury issues a subpoena *duces tecum*, an affidavit from "the Government [is] required to make some preliminary showing . . . that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose." *Schofield I*, 486 F.2d at 93.

[99]    Most jurisdictions do not follow this rule because in *United States v. Dionisio*, the U.S. Supreme Court held that the Constitution does not require the government to make a preliminary showing that subpoenaed materials are relevant or that the subpoena is not being used for harassment.  *United States v. Dionisio*, 410 U.S. 1-2, 16 (1973).  *Dionisio* emphasized the importance of maintaining the grand jury's independence and protecting it from "minitrials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *Id.* at 17.  The Court concluded that the grand jury "must be free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it." *Id.* at 17-18.  But "[i]n spite of the strong language in the *Dionisio* case rejecting the efforts of a lower court to require a preliminary showing of reasonableness in connection with

---

[16] Appellant does not argue the Guam statute requires an affidavit.  The California Court of Appeal has rejected any affidavit requirement based on their statutory scheme.  *See generally M.B. v. Superior Ct.*, 127 Cal. Rptr. 2d 454 (Ct. App. 2002).

a grand jury subpoena, the Third Circuit Court of Appeals has imposed such a requirement under its supervisory powers over the courts under its jurisdiction." Beale et al., *supra*, § 6:23.

[100]   Even in those jurisdictions that have adopted the minority rule, "there is no requirement that either a subpoena or Schofield affidavit bear a facial allegation of a crime." *Robert Hawthorne, Inc.*, 412 A.2d at 561 n.13. And in the Third Circuit, *Schofield* affidavits now seem perfunctory:

> Indeed, it now appears that in the absence of some particularized basis for the witness's claim of irrelevance or harassment, a Schofield affidavit will be regarded as sufficient in the Third Circuit even if it simply contains a conclusory assertion by the prosecutor that the evidence sought from the subpoenaed party is relevant to the grand jury's investigation and that the grand jury is not using the subpoena for an improper purpose.

Beale et al., *supra*, § 6:23.

[101]   Contrary to Appellant's suggestions, even if this court adopted a *Schofield* affidavit requirement, such affidavits would not need to bear the facial allegation of a crime. We decline to exercise our supervisory powers to require *Schofield* affidavits because they seem unlikely to bring much practical benefit to subpoenaed witnesses. As one treatise explains: "[T]he burden on a witness to persuade a court that the grand jury is engaged in an improper investigation is a difficult one to meet, even with the assistance of the *Schofield* procedures." Beale et al., *supra*, § 6:23 (emphasis added). "The witness's unenviable task is to seek to persuade the court that the subpoena that has been served on the witness could not possibly serve any investigative purpose that the grand jury could legitimately be pursuing." *Id.* Even under the minority rule, the witness retains the burden of showing that the subpoena serves no investigative purpose that the grand jury could legitimately pursue. It seems to make little practical difference whether the general purpose of the investigation is disclosed in an affidavit, or in a more informal manner.

[102]   We adopt the majority rule and find it is sufficient for the People to disclose the general nature of the grand jury's inquiry and rely on the presumption that the proceedings are reasonable.

### 2. *In camera* review of grand jury proceedings is within the discretion of the trial court

[103]   Appellant cites *R. Enterprises* to support their argument that "[t]he trial court should have performed in camera review of the proceedings before the grand jury to determine the scope of the grand jury inquiry." Appellant's Br. at 46. Most of this argument assumes that Guam law requires a grand jury to be presented with a proposed indictment before it can begin its inquiry. *See id.* at 46-48. Appellant argues that they made a substantial showing that the grand jury was not presented with an indictment before issuing the subpoena, but that is the incorrect legal standard.

[104]   A trial court has the discretion to decide whether to conduct *in camera* review. *Cf. People v. Superior Court (Quint)*, 1997 Guam 7 ¶ 10 (holding trial court has discretion to review discovery documents *in camera*). We "cannot reverse absent a 'definite and firm conviction that the [trial] court committed a clear error of judgment.'" *See In re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d 826, 829 (9th Cir. 1994) (citation omitted). Beyond arguing the trial court did not apply the legal standard Appellant advocated for, Appellant points to nothing that shows the trial court abused its discretion. Appellant seems to imply in filing their request for judicial notice that because another Superior Court judge reviewed the grand jury information *in camera* and eventually quashed the subpoena to Agency 1, the court abused its discretion in not doing the same in this case. "That other trial courts have reached different conclusions on similar facts, however, does not amount to an abuse of discretion by the district court in this case. Indeed, discretion by its very nature permits different judges to reach different—but reasonable—conclusions on the same set of facts." *Bracey v. Grondin*, 712 F.3d 1012, 1020 (7th Cir. 2013) (citations omitted). Because Appellant has made no showing that the trial court's decision here was unreasonable, there was no abuse of

discretion—even if a different court would have reached a different conclusion.  The decision was "within the outer limits of the range of choices appropriate to the issue at hand."  *Bosi*, 2022 Guam 15 ¶ 66 (citation omitted).

### 3. The trial court did not abuse its discretion when it found that the subpoena was relevant and not oppressive

[105]  Appellant does not directly challenge the trial court's conclusions that the materials sought by the subpoena *duces tecum* were relevant to the general subject matter of the investigation, or that the request was no longer oppressive given the passage of time.  Instead, they argue that "[a]vailable evidence demonstrated that the [People] did not present a bill of indictment to the grand jury, and instead convened an improper investigative grand jury to conduct a general investigation into all possible criminal activity."  Appellant's Br. at 36.  That is not the correct legal standard.

[106]  Title 8 GCA § 75.20 states that "[t]he court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive."  This is based on former Rule 17(c) of the Federal Rules of Criminal Procedure, *id.*, Note, which applies to motions to quash grand jury subpoenas, *R. Enterprises*, 498 U.S. at 303 (Stevens, J. concurring) ("Federal Rule of Criminal Procedure 17(c) authorizes a federal district court to quash or modify a grand jury subpoena *duces tecum* 'if compliance would be unreasonable or oppressive.'").

[107]  A review of the trial court's decision in this case shows it correctly articulated the standard for quashing a subpoena *duces tecum* and applied it to the facts that it found.  RA, tab 18 at 4-5 (Dec. & Order).  Appellant's argument misunderstands their burden in the trial court and what it now is on appeal.  Appellant bore the burden of rebutting the presumption that the grand jury subpoena was reasonable, but the trial court made the factual finding Appellant did not rebut that presumption.  On appeal, Appellant now bears the burden of showing the trial court's finding was

clearly erroneous. In other words, Appellant must show that the trial court's determination that Appellant failed to rebut the presumption of reasonability is unsupported by substantial evidence. Instead, Appellant tries to shift this burden by arguing that the People did not present competent evidence to support the finding that the subpoena was reasonable.

[108] A presumption is not "evidence." *E.g.*, *Barron v. Lab. Comm'n*, 2012 UT App 80, ¶ 18, 274 P.3d 1016 ("A presumption is merely a burden-shifting device; it is not evidence."). However, once properly raised in the trial court, a presumption continues to have evidentiary force on appeal. As the New Mexico Supreme Court has explained,

> More importantly for the purposes of our sufficiency of the evidence review on appeal, under [the equivalent of Federal Rule of Evidence 301] a presumption once raised in both jury and non-jury trials continues to have evidentiary force, regardless of the contradictory evidence presented by the party against whom it is employed. Thus, although the raising of the presumption does not mandate any final result at trial, if the fact finder concludes that the party raising the presumption has prevailed and we find sufficient evidence to support the raising of the presumption, we will not set aside the fact finder's conclusion on appeal.

*Chapman v. Varela*, 2009-NMSC-041, ¶ 12, 146 N.M. 680, 213 P.3d 1109.

[109] Because Appellant articulates no reason for setting aside the fact finder's conclusion on appeal, we affirm the trial court's decision about the relevance of the materials sought. Additionally, because the only basis Appellant challenged the oppressiveness of the subpoena was the timing of it so close to Typhoon Mawar, we conclude the trial court did not abuse its discretion in finding the request was not oppressive months after the fact. We affirm the decision to deny the motion to quash the subpoena.

## V. CONCLUSION

[110] The Guam Legislature has adopted the common law grand jury, with its own alterations. The Superior Court applied the correct legal standard when it construed Guam's grand jury scheme

in light of the common law decisions of other courts. The trial court correctly concluded that a grand jury need not identify a felony at the outset of its inquiry.

**[111]** The law presumes that a grand jury acts within the legitimate scope of its authority, without a strong showing to the contrary. The trial court found that Appellant did not rebut the presumption that the grand jury was acting within the scope of its authority. On appeal, Appellant fails to show this finding was clearly erroneous. The trial court did not abuse its discretion in denying the motion to quash because it applied the correct legal standard, and its factual findings are supported by substantial evidence. We **AFFIRM**.


| /s/ | /s/ |
|:---:|:---:|
| F. PHILIP CARBULLIDO | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |


/s/
ROBERT J. TORRES
Chief Justice